ROBERT J. AMBRUSTER, Appellant, v. EDITH E. AMBRUSTER and WILLIAM AMBRUSTER UNDERTAKING COMPANY.—31 S. W. (2d) 28.

Division One, September 4, 1930.

52

*Mark D. Eagleton* and *Hensley, Allen & Marsalek* for appellants.

*Holland, Lashly & Donnell* for respondents.

ELLISON, C.—This is a suit to establish a trust—implied as to part of the property involved, and express as to all of it. The plaintiff is the son and only child of the individual defendant, Edith E. Ambruster, and her deceased husband, Wm. Ambruster. The petition seeks a decree adjudging the mother trustee for the son with respect to all the capital stock of the corporate defendant, the Wm. Ambruster Undertaking Company, and about $150,000 worth of real estate and securities charged to be earnings and accumulations therefrom. The circuit court found for the defendants and dismissed the plaintiff's bill, and he has appealed.

The father died in October, 1916, when the appellant was 22 years old. For some sixteen years he had conducted an undertaking business in St. Louis with which the mother was actively connected, and the son also had worked at it from the time he was ten or twelve years of age. The business was incorporated in January, 1915, less than a year before the father's death with a capital of $2,000, all paid up in personal property, a hearse, an automobile, two horses, a wagon and buggy, and certain furniture, equipment and instruments. The articles of incorporation, signed and sworn to by all the shareholders, showed the father to have subscribed for fifteen shares, the mother for three and the son for two. These three composed the board of directors. The son and the lawyer who did the legal work in connection with the organization of the corporation had a recollection that stock certificates were issued conforming to the recitals in the articles of association. The mother and the attorneys who handled the probate administration had a contrary impression.

Shortly after the father's death the mother was appointed his administratrix. The application for letters recited the total value of the estate did not exceed about $1500, and her verified inventory filed a little later listed the fifteen shares of corporate stock, valued at $1500, and certain jewelry valued at $500, as the sole assets of the estate. In March, 1917, the corporation filed an itemized bill aggregating $1546.50 for the father's funeral expenses. This demand was allowed without objection, and when the time for the first semi-annual settlement came in June, 1917, the mother, as administratrix, filed a petition under Section 116, Revised Statutes 1919, apparently, for an order to sell all the personal property of the estate at private sale to pay debts, the corporate stock to be disposed of at its par value, $1500.

The probate court granted the petition on presentation, it seems, and entered an order allowing a private sale for the best cash price obtainable. Thereafter on the same day the administratrix filed her first settlement charging herself "with personal property as per inventory, two thousand dollars," and asking credit for certain itemized disbursements aggregating $1982.25, chief among which was the funeral bill of $1546.50 and her $400 widow's absolute allowance. The balance remaining was $17.75. The settlement was approved, and in January, 1918, she filed her final settlement showing the payment of probate costs in an amount slightly exceeding the small balance remaining over from the previous settlement. Thus the estate was closed.

There is nothing in the court records expressly showing the probate sale was ever made, to whom, or on what terms. But the parties by their pleadings and evidence concede what really occurred was that the administratrix sold the fifteen shares of corporate stock to herself and, paid for it by causing the funeral bill to be receipted by the Undertaking Company, without personally paying any consideration whatever to the latter or to anyone else. Later, on December 31, 1918, the bill was charged off the books of the corporation, unpaid.

One of the appellant's contentions is that the administratrix by purchasing the stock at her own sale in the circumstances recited, became seized of a one-half part thereof, or 7½ shares, as trustee for him, he being beneficially entitled to that portion as sole heir of his father and the mother taking the other half as dower in personalty under Section 319, Revised Statutes 1919. At the same time, the appellant admits he made out and filed the funeral bill and indorsed the corporation's receipt thereon though it was not paid; and he further admits he knew his rights as an heir, that the stock was inventoried as his father's property, and that the effect of the sale was to transfer the title to the mother.

The appellant accounts for his acquiescence in the probate sale proceedings by saying he followed his mother's directions in the matter; that she told him the administration and sale were necessary to establish his rights as sole heir against an anticipated claim to adoption on the part of a young woman who had been taken in the home years before, and also to clear their undertaking business of any claims of the father's creditors. He says the mother was secretive regarding the administration and admonished him to be so in order to carry out the above purposes, but that she never disclosed to him any intention to set up a claim to the corporate shares by virtue of the sale antagonistic to his own interest.

The mother testified she had no recollection of the details of the transaction; that she paid no attention at the time and didn't remember a thing about it. She did whatever the appellant and the attorney handling the estate told her to do. The attorney, Judge Henry A. Hamilton, did not altogether corroborate her. He said Mrs. Ambruster usually came with her son when they discussed estate matters and that she informed him Mr. Ambruster had bought her some jewelry shortly before he died, which he had not paid for. For sentimental reasons she did not want this bill probated, so they had the funeral bill allowed with the intention of selling the fifteen shares of stock to pay debts. The son brought him the receipted funeral bill when he made the first settlement, but did not explain how it had been paid. It is to be inferred Mrs. Ambruster paid the jewelry bill. She testified she also paid expenses connected with her husband's last sickness which were never probated, such as bills for doctors, nurses and drugs.

Passing on to the other branch of the case. After the father's death in October, 1916, the mother and son continued to conduct the undertaking business together like partners. The appellant was the active manager and the mother served more in an advisory capacity and in supervising the fiscal policy. During the first year she was absent from St. Louis a good part of the time. The undertaking concern kept no separate bank account. Prior to the father's death he and the mother had a joint account in the Manchester Bank and after the corporation was formed until his death they still used it for their business. A short time before the father's demise the mother notified the bank that the appellant was authorized to sign checks on the account. They also had a safety deposit box in the bank in which all securities were kept.

On December 4, 1917, the son and the mother transferred the securities from the Manchester Bank to a box at the Mortgage Trust Company, taken in the name of the corporation and to which both parties had access. The appellant says on that occasion he told his mother he couldn't live on a salary all his life (he was then

receiving $125 per month) and that his father had always told him the undertaking business had been established and was being built up for him. The mother replied that the father had told her never to part with the business as long as she lived. The son questioned this statement in view of what the father had told him and then, he says, the mother made a contract with him. His exact testimony as to the contract is as follows:

"Mamma says, 'You go ahead and run this business and continue on; when I get fifty thousand dollars I will quit this business and turn it over to you.' That is substantially what was said. I don't remember the detailed language, and, with that understanding, we continued on—there was no argument about it."

This is the contract on which the appellant relies as establishing the express trust claimed in his petition. The mother flatly denied she ever had made such a statement or agreement. Mr. C. R. Hamilton, a brother and partner of Judge Hamilton, succeeded to the Ambrusters' law business after the latter became circuit judge. He testified Mrs. Ambruster told him in about 1927 that her son was claiming there had been a contract of the above nature. She said she was positive she had not made it, and continued, "I don't know, I might have been talking to Bob and said 'when I get a certain amount of money I will let you have the business,' but I don't recollect having said that." Judge Hamilton and Mr. C. R. Hamilton both swore that in all the years of their intimate social and business contact with the Ambrusters, the appellant never claimed he had a contract with his mother until after trouble arose between them in 1927 or 1928.

The remaining evidence bears principally on what was done by the parties in subsequent years. In January, 1918, Mr. C. R. Hamilton was employed to install a set of corporation records and account books. He was unable to discover any certificates showing the stockholdings as recited in the articles of association. So he bought a stock book and in February, 1918, certificates were issued as follows: to Mrs. Ambruster for 18 shares, to the appellant for one share and to C. R. Hamilton for one share. The certificates of the appellant and Mr. Hamilton were at once assigned in blank on the back but Mrs. Ambruster's certificate was not so endorsed. The appellant's explanation of this transaction which left only one share of stock in his name whereas by the articles of incorporation even before his father died he had two and his mother only three. is that they wanted to get the corporation organized "according to Hoyle."

Mr. Hamilton testified that at the meeting when the stock was thus parcelled out Mrs. Ambruster declared she owned all of it. He explained to her it would nevertheless be necessary to issue two qualifying shares in order to make three stockholders and directors

as the law required. So one share was issued to him and one to the appellant and both endorsed their certificates in blank and delivered them back to Mrs. Ambruster. The appellant was present when the conversation occurred and did not disagree or protest. On redirect examination he said the reason he didn't object was because they "were merely trying to get the company going" and he thought his mother would keep her contract with him.

Following out this line of evidence, the stock record shows the certificate issued to C. R. Hamilton to have been still in his hands at the time of trial. The one share certificate originally issued to the appellant was cancelled on March 12, 1919, and a new certificate issued to Mrs. Ambruster. This was cancelled and the one share transferred to Florenz Eynck on October 1, 1919. He was an employee and this share was put in his name so he could be an officer of the company and thereby circumvent some union labor rule. He was not the beneficial owner of the stock and held it less than a year, for in July, 1920, a new certificate for that share was issued to the appellant, which he assigned in blank. It stood in that form when the case was tried. It thus appears, however, that he was without any stock whatever from March, 1919, to July, 1920. On January 14, 1924, Mrs. Ambruster's original certificate for 18 shares was split into one certificate for 14 shares issued to her and one for 4 shares issued to the appellant. This certificate, also, was outstanding when the case was heard and had been assigned in blank. When he signed it the appellant requested his mother to endorse hers in the same way, but she refused. None of Mrs. Ambruster's certificates were so assigned.

A little over two years later the appellant executed a written statement dated February 9, 1926, as follows:

"To Whom It May Concern—Greeting:

"This is to certify that the five shares of stock of the Wm. Ambruster Undertaking Co. standing in my name are the absolute property of my mother, Edith E. Ambruster, and that the only reason that same were issued in my name was to facilitate the payment of a bonus arrangement which I have with the company."

He and his mother placed this statement with all the outstanding stock certificates aforesaid in an envelope marked "Stock Certificates Wm. Ambruster Und. Co." which was kept in the safety deposit box heretofore mentioned. The appellant says his reason for executing the statement was that after the 4 shares of stock were issued to him in January, 1924, his mother frequently complained that his wife might make trouble and claim the stock if he should die before the mother. So finally one day he said, "Quit talking about it. I will write you a letter and we will cover it that way." The mother denied the conversation and said the appellant volunteered or agreed to write the letter for the purpose of showing he had no real interest in

the stock. She also said she had no feeling against the appellant's wife except that the latter had told two falsehoods about her, but later had retracted the statements.

The bonus arrangement referred to in the written statement of February 9, 1926, was made this way. During the year 1922 the mother drew a salary of $750 per.month and the appellant $200 per month. He was $800 overdrawn on his expense account and the mother was complaining about his extravagance. He went to see her at the Chase Hotel, where she lived, and announced he was going to leave and go to California. After some impassioned argument the mother and he agreed each should draw a salary of $100 per week and he should receive twenty-five per cent of the earnings of the business. At the end of that year when accountants discovered he was receiving a fourth of the profits they suggested he ought to have a fourth of the stock, to correspond. This resulted in the issuance to him of the stock certificate for four shares dated January 14, 1924. The mother corroborated the appellant as to this conversation. In addition she testified the appellant told her he had been offered a salary of $10,000 per year elsewhere, but wouldn't say by whom; and that she agreed to let him have twenty-five per cent of the earnings on condition that he save the money.

The evidence shows the mother drew the lion's share of the earnings of the Undertaking Company during the years of association of the appellant and his mother in the business. In the beginning this was because they desired to absorb the profits of the business in salaries on account of the income tax laws. The mother owned the building in which the business was conducted and she also drew a heavy rent for that. The income received by each, as shown by the minutes of directors' or stockholders' meetings and the testimony, is set out in the following table, the dates given being the dates of the minutes:

| | MRS. AMBRUSTER | | | ROBT. J. AMBRUSTER | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Salary per year | Dividend | Rent | Salary per year | Dividend | Bonus |
| Jan. 8, 1917 | $3000 | | $1200 | $1500 | | |
| Jan. 14, 1918 | 6000 | | 1200 | 1500 | | |
| Jan. 12, 1919 | 6000 | | 2400 | 750 (6 mo's) | | |
| June 30, 1919 | | | | 1200 (6 mo's) | | |
| Jan. 11, 1920 | 3000 (6 mo's) | | 1200 (6 mo's) | 2400 | | |
| June 29, 1920 | 4500 (6 mo's) | | 1500 (6 mo's) | | | |
| Dec. 15, 1920 | | | | | | 1000 |
| Jan. 10, 1921 | 9000 | | 3000 | 2400 | | |
| Jan. 9, 1922 | 9000 | | 3000 | 2400 | | |
| Jan. 8, 1923 | 5200 | | 4200 | 5200 | | |
| Jan. 14, 1924 | 5200 | | 4200 | 5200 | | |
| Feb. 2, 1924 | | 1500 | | | 500 | |
| June 24, 1924 | | 1500 | | | 500 | |
| June 12, 1925 | 5200 | | 4200 | 5200 | | |
| Jan. 17, 1925 | | 1500 | | | 500 | |
| Mch. 28, 1925 | | 1500 | | | 500 | |
| Apr. 30, 1925 | | ·1500 | | | 500 | |
| Dec. 28, 1925 | | 1500 | | | 500 | |
| Jan. 15, 1926 | 7500 | | 4200 | 6000 | | |
| ——, 1927 | 7500 | | 4200 | 4000 (8 mo's) | | 1100 |

But the foregoing table does not show all the money paid to or for the benefit of the mother and son, respectively. The mother began to speculate in real estate on her own account in 1922, or thereabouts, and substantial amounts were laid out by the corporation in improving or repairing her properties, particularly the one rented to the Undertaking Company. The lease required the company to make its own repairs, but according to figures compiled by a certified accountant who testified as a witness for the appellant, the total amounts received by the mother from the company between 1922 and 1927, including amounts expended for real estate improvements which properly should not have been classed as "repairs," was as follows:

| | |
|---|---|
| 1922 | $16,072.39 |
| 1923 | 10,585.61 |
| 1924 | 13,909.26 |
| 1925 | 15,683.15 |
| 1926 | 12,529.60 |
| 1927 | 19,043.42 |
| Total | $87,823.43 |

Other scattered items were shown to have been paid out for the mother's benefit, but we shall not go into them here. As to the son, in addition to the salary, bonus and dividends shown in the itemized table, he was allowed a liberal expense account for cigars, lodge dues and other items. The books showed the account ran to $2323.21, in 1926, though the appellant questioned those figures. He also used an automobile belonging to the company for his personal use and bought and paid for one out of the corporation's funds in December, 1927. The appellant asserted these expenditures were legitimate and necessary in the business, and as to the automobile he said he bought that because his mother took the one he had been using.

In addition to the foregoing, the evidence disclosed that when the case was tried the appellant owned and was living in an apartment house which cost him $40,000. He bought it in 1923 or 1924 and the mother borrowed $15,000 from the bank to make the down payment. He gave a note and deed of trust for $25.000 to cover the balance of the purchase price and when that came due the mother took it over and was still holding it. He was living in one of the apartments in the building and rented the other three for $375 per month, gross, but said this did not meet the interest he was paying on the second mortgage—after deducting the upkeep. It was also shown that the appellant and his family and friends were permitted to use a country place near Steelville in Crawford County, which the mother had bought at a cost of $13,500. He had two saddle horses down there and a pony for his child.

But offsetting this indulgence the appellant told about buying a lot in 1915 when he was married. He had saved $1,000 and his parents gave him about $1100 more to make up the purchase price of $2100. He built a flat on the lot costing about $8,200 and the parents took back an $8,000 mortgage after furnishing the money for that. He considered he had a $4,000 equity in the property. When the war came on in 1917 or 1918, at the suggestion of relatives he deeded the flat to his mother to escape the draft. She sold it in about 1923 for $21,000 of which $18,000 was in deferred payments. He says the mother told him she was going to give him the money from that paper when it was paid, but she never did.

As stated a few paragraphs back the mother began to speculate in real estate in about 1922. She already owned two properties at 4234-6 Manchester Avenue which had been held by her and her husband as tenants by the entirety. She also had the $8,000 mortgage on the appellant's flat, $8,000 in insurance money on the father's life and $5,000 in bonds purchased before the alleged contract was made in 1917. Between 1922 and 1928 she accumulated through these resources and out of her income from the undertaking business and the interest, rents and profits from her investments some nine pieces of real estate and securities of one kind or another, all inventorying at cost over $185,000, and actually worth more than $200.000 according to the appellant's testimony.

It was not questioned that during all these years the appellant was in active managerial charge of the undertaking business: that he sold the caskets and undertaking supplies, directed funerals, hired the help most of the time, probated demands and generally attended to the operating end of the business, including advertising; and that he usually was consulted by his mother about their business policies. There was only one time when their salaries were not fixed by agreement. On that occasion the appellant wanted more than his mother would consent to, so he refused the small increase she offered and worked on for the pay he had been getting the previous year. In 1916 when the father died the year's gross business was about $22,000. In 1927 when the appellant withdrew, it had grown to $58,000. Also the concern conducted a funeral livery business which paid about $1200 per year in 1916 and about $25,000 in 1927. In excess of dividends and salaries paid, the business showed a profit in 1922 of $3600, in 1923 of $12,049, in 1924 of $1571, in 1925 of $7803, in 1926 a loss of $1189 and in 1927 a profit of $782.

Getting back to the alleged contract made in December, 1917. Sometime after that and prior to 1922, the date not being more definitely fixed by the appellant, he and the mother were examining the securities in the safety-deposit box. They then amounted to about $30,000 to $32,000, and he testified he remarked to her that it wouldn't be long until she would have accumulated $50,000 as provided in the

contract. The witness could not recall what reply she made, but he says she didn't contradict or deny the agreement though she talked about it. In 1923 or 1924 after she had saved $50,000 or more, he spoke to her again one day. She answered that living conditions and war prices made it necessary for her to build up a capital of $100,000 instead of $50,000. The appellant says he didn't argue with her about it. Early in 1927 he broached the subject once more. She then owned property and securities inventorying $185,000, but she told him she now wanted $200,000. He dropped the question, but a few days later approached her again. This was probably in January, 1927. Then, for the first time, the mother denied the contract altogether and asserted the company was hers, lock, stock and barrel. But the appellant nevertheless continued with the corporation that year and until January 29, 1928, as will be explained.

In the summer of 1927 the mother and son planned some improvements of their business quarters. The son left for a vacation in July with the understanding that the changes would consist mainly of refurnishing the rooms and making certain alterations in the building, by way of putting in partitions, all at a cost not exceeding $5,000. When he returned early in August he found his mother, on the advice of an employee, had made much more elaborate improvements, including the erection of an addition to the building, calling for the expenditure of about $10,000 or $12,000. The appellant was provoked that the mother should follow the advice of a mere employee as against his own regarding a matter of such importance, and after reflecting on the matter several days, told his mother he was going to leave, first having ineffectually demanded that he be put in full charge of the business.

He did go to Detroit and stayed at a hotel about a week. There he wrote his mother a letter stating that he was in great mental distress over the breach and suggesting that she write him. She did, but on his return he did not find her at home, and when he did meet her he was not received with the cordiality and affection he had expected. So he kept aloof for about a month and again threatened to leave, but after a conference with his mother went back to work early in September. A change had come over the employees. His authority was not recognized as theretofore. His mother found fault with his wife, and he learned of statements two of the employees (or their wives) had made. After overcoming his mother's opposition he discharged them. He talked to mutual friends about the trouble, but conditions did not improve. In January, 1928, they had a heated discussion and his mother told him to leave. That brought the final separation. When the case was tried he was conducting a competing business.

Two other fragments of testimony should be noted, as well as another line of evidence raising one of the legal questions urged by appellant here. The fact was brought out on the cross-examination of appellant that after he and his mother had separated he offered through his attorney or friends to buy the undertaking business for $40,000. Counsel for appellant objected on the ground that it was an offer of compromise. The objection was overruled. In connection with the cross-examination of the mother it was shown that in a deposition taken before the trial she was asked by what right she claimed all the stock of the Undertaking Company and she answered, "Possession." Being asked if that was all, she answered, "Why no, it is not all; I own it. . . . I told you upon possession. That is nine points of the law, I believe."

On direct examination the appellant testified that the bank account kept by his mother and father was in their joint names for the benefit of either or the survivor. He thought his name was added to it after ·the father's death. On cross-examination it was shown the authorization for him to sign checks was given on September 29, 1916, a little over a week before Mr. Ambruster died; and the further admission was elicited from him without objection that the personal property turned over by the three shareholders in payment of their stock subscriptions when the corporation was organized, had previously been purchased out of this joint bank account. Also, he admitted that even after the corporation was formed until the father's death the business was conducted by the mother and father as a joint venture in the sense that all deposits therefrom were kept in this joint bank account.

The mother testified that both she and her husband were authorized to draw checks against the joint bank account, and that during Mr. Ambruster's lifetime he signed most of the checks. But when she was asked who owned the property paid in by the incorporators, counsel for appellant objected that this was immaterial because the ownership of the stock became fixed when the corporation was formed, and as to the shares held by the deceased Wm. Ambruster, the respondent mother was estopped to dispute his ownership, since she, as administratrix, had inventoried them as his. To this respondents' counsel answered that equity could inquire into the ownership of the property that was used to pay for the stock—whether it was joint property. Counsel for appellant rejoined that in addition to the objections they had already made the respondents' answers did not affirmatively set up a joint ownership of the property subscribed as capital and attempt to trace it into the stock; that the answer contained only a general denial and a plea of the probate sale to the mother (which is true). Respondents' counsel then asserted that the general denial was sufficient to let in this evidence, and the court overruled the objection,

Thereupon the mother was permitted to testify that she had worked in a store in former years and borrowed money from a relative; and that most of the money in the joint bank account had been put in by her; and that she had bought part of the property capitalized when the corporation was formed and listed in the articles of incorporation; and that all of it was paid for out of the joint bank account. Then she told how she and Mr. Ambruster had run the undertaking business together for years before it was incorporated. On this appeal one of the respondents' claims is that she owns all the stock of the corporation because she and her deceased husband were seized as tenants by the entirety of the funds used in buying the property exchanged for the stock in the beginning. Other facts will be noted in the course of the opinion as necessary.

I. The rule is well settled that an extraordinary degree of proof is required to establish a parol trust in either realty or personalty. The cases use various expressions, as that the showing must be "clear," "cogent," "convincing" or "such as to leave no room for a reasonable doubt in the mind of the chancellor." [23 A. L. R. pp. 1500, 1508, note; Pitts v. Weakley, 155 Mo. 109, 133, 55 S. W. 1055, 1062.] Measured by this standard we think the proof adduced by appellant is insufficient to establish the alleged express trust whereunder he was to become the owner of all the capital stock of the Wm. Ambruster Undertaking Company when his mother had accumulated $50,000. The facts have been fully reviewed and we shall not comment on them in detail. The matter may be summed up by saying that in our opinion there is not a clear and satisfying preponderance of evidence showing a *contract* was made and that the appellant's connection with the undertaking business was solely referable thereto. This far we agree with the trial court.

II. But as regards the two shares allotted to the appellant in the articles of incorporation, and his half interest in the 15 shares left in the father's estate, 9½ shares in all, we have reached a different conclusion. The mother does not claim she ever paid the appellant for his two shares or that she, personally, ever paid the corporation or the estate anything for the 15 shares she bought at the administratrix's sale. But she contends, first, that all the stock was hers from the time of Mr. Ambruster's death, notwithstanding the recitals in the articles of incorporation and the probate records, because the property paid in for corporate capital had been purchased out of the joint bank account kept by her and her husband. In other words, she maintains her interest in the joint bank account was that of a tenant by the entirety, and she

attempts to trace that title into the undertaking equipment bought with the bank account, and thence into the corporate stock for which that property was exchanged.

We do not think this defense is available to the mother, because she did not plead it. If it is, it can only be within a narrow scope, as will be later explained. The corporate records and particularly the articles of incorporation introduced in evidence were appellant's muniment of title so far as concerned that branch of the case (Williams v. Everett (Mo.; Ct. en Banc), 200 S. W. 1045, 1050), and together with proof of his heirship were sufficient to establish his legal title to the stock in the first instance. The mother sought by this defense to go behind that title by showing she was joint owner of the bank account that paid for the property that paid for the stock. Her counsel in arguing to the trial court said *equity* could trace the consideration and inquire into the real ownership of the stock. That is true, but it was an equitable defense, an affirmative defense in the nature of new matter or confession and avoidance, and could not be shown under a general denial. As said in Northrup v. Miss. Val. Ins. Co., 47 Mo. 435, 444, 4 Am. Rep. 337, "the defendant, by merely answering the allegation in the plaintiff's petition, can try only such questions of fact as are necessary to sustain the plaintiff's case." See also Grafeman Dairy Co. v. Northwestern Bank, 315 Mo. 849, 870, 288 S. W. 359, 368; 49 C. J. sec. 361, p. 294. "The general rule is that to be available an equitable defense must be pleaded." [49 C. J. sec. 223, p. 194.]

But the respondent argues that even if her testimony on this point be excluded from consideration there yet remain the admissions of the appellant on direct and cross-examination, made without objection. These in substance were that before the undertaking company was incorporated the father and mother had a joint bank account, a family account as the witness called it, standing in their names, either or the survivor to draw. Both the father and mother did write checks, and the property paid in as capital when the corporation was formed had been purchased therefrom. Following the incorporation in January, 1915, the same account was used until after the father's death nearly a year later. These facts, the respondent insists, are sufficient to establish her interest as tenant by the entirety in the corporate stock of the undertaking company.

That a husband and wife can own a bank account as tenants by the entirety may be conceded (Craig v. Bradley, 153 Mo. App. 586, 134 S. W. 1081); and that they or two or more other persons may

hold such an account as joint tenants has been declared by statute as well as the decision of our courts of last resort. [Secs. 11779, 11840, R. S. 1919; Miss. Valley Trust Co. v. Smith, 320 Mo. 989, 9 S. W. (2d) 58 and cases cited.] But the question in the instant case is not as to the respective rights of the joint tenants in the balance standing in the bank from time to time, nor as to the title of the mother to the whole fund by survivorship on the death of the father. The point here involved is whether, when an account is so deposited as to permit either joint tenant to draw at will, the withdrawal of a part of the fund by one of the joint tenants operates as a severance of that part and an authorized appropriation thereof to his own use, or whether the other tenant still retains his joint interest in the money thus abstracted and can compel an accounting therefor, as between the two. Much has been written on the general subject (see 48 A. L. R. 189, note; L. R. A. 1917C, p. 550, note; Ann. Cas. 1916D, p. 519, note); but there are few cases on the precise question presented by this record.

Our statutes, Sections 11779 and 11840, the first referring to banks and the second to trust companies, provide as follows:

"When a deposit shall have been made by any person in the name of such depositor and another person and in form to be paid to either, or the survivor of them, such deposit thereupon and any additions thereto made by either of such persons, upon the making thereof, shall become the property of such persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to either during the lifetime of both, or to the survivor after the death of one of them; and such payment and the receipt or acquittance of the one to whom such payment is made shall be a valid and sufficient release and discharge to said bank for all payments made on account of such deposit prior to the receipt by said bank of notice in writing signed by any one of such joint tenants not to pay such deposit in accordance with the terms thereof."

They were enacted in 1915, Laws 1915, pp. 154, 190, after the withdrawals involved in this case had been made. But the opinion is expressed, though the point is not decided in Miss. Valley Trust Co. v. Smith, supra (320 Mo. 1. c. 1003, 9 S. W. (2d) 1. c. 63), that the sections announce a rule of evidence and are therefore applicable to accounts opened before their passage. However this may be, it will be helpful to keep the statutes in mind in connection with the decisions.

In O'Connor v. Dunnigan, 158 App. Div. 334, 143 N. Y. Supp. 373, affirmed, memo., 213 N. Y. 676, 107 N. E. 1082, a bank deposit was made payable to "Mary Guilfoyle or Joseph Guilfoyle. Pay to either or the survivor of either." A little over four years later,

the account apparently being inactive in the meantime, Mary Guilfoyle drew out all the money without the knowledge or consent of Joseph Guilfoyle and opened a new account in her own name, which she bequeathed to a third party by her will drawn the next day. She died three days thereafter. The New York Supreme Court held the deposit in the foregoing form created a joint tenancy and that the withdrawal of the money by Mary Guilfoyle without the consent of Joseph Guilfoyle did not divest him of his interest therein, but that upon her death he was entitled to the whole sum by right of survivorship as against her legatee. This case was decided on common-law principles.

But about the time of the O'Connor decision a statute similar to ours was enacted in New York, and this statute was subsequently amended by the addition of a sentence (which does not appear in ours) providing "the making of the deposit in such form shall, in the absence of fraud or undue influence, be conclusive evidence, in any action or proceeding to which either such savings bank or the surviving depositor is a party, of the intention of both depositors to vest title to such deposit and the additions thereto in such survivor." The statute was construed in Moskowitz v. Marrow, 251 N. Y. 380, 167 N. E. 506, and Newhouse v. Harrinck, 227 App. Div. 392, 237 N. Y. Supp. 484, and was held to be conclusive only of the right of the survivor to take the balance on hand at the death of his cotenant, and even then only in actions to which the survivor or the bank was a party. As to moneys withdrawn during the lives of both tenants it was ruled the statute made the joint form of the deposit merely *presumptive* evidence of their joint interest therein.

In Dickson v. Jonesboro Trust Co., 154 Ark. 155, 242 S. W. 57, a deceased husband carried an account in each of two banks to the credit of "G. B. Dickson and wife." The money was deposited by him out of his earnings and no part was the separate property of his wife. The accounts were active and he drew all checks, though it was not shown checks drawn by the wife would not have been honored. Out of these bank accounts he loaned money to his sons and took their notes therefor. He also purchased certain Liberty Bonds and Thrift Stamps payable to bearer, which he left with the bank for safekeeping. The interest on these he deposited in the joint bank accounts. When he died there was about $5,000 in each. The widow claimed all this money as tenant by the entirety, and the notes, Liberty Bonds and Thrift Stamps as well. The Supreme Court of Arkansas held she was entitled to the funds on deposit, but not to the securities. As to the latter, the court said when the husband drew checks with his wife's knowledge and consent he reduced the sums withdrawn to his separate possession and thus destroyed the estate by the entirety with respect thereto.

In Marble v. Treasurer & Receiver General, 245 Mass. 504, 507, 139 N. E. 542, at the death of the husband some five or more bank accounts were in existence payable to "J. Russell Marble or Emily G. Marble. Subject to withdrawal of whole or part by either or the survivor of either." In two of the accounts the connective between the names of the husband and wife was "and," and one account was "payable to either or the survivor." The court said these accounts created neither an estate by the entirety nor a joint tenancy in the accurate sense of those terms, because the form of the deposits was such as expressly permitted either husband or wife alone to draw out all or any part of the money during their joint lives without the consent of the other; whereas a tenancy by the entirety cannot be severed without the consent of both owners, and while a joint tenancy may be yet even then each tenant can dispose only of his own severed interest. The case in effect holds the interest of each depositor is simply the right to draw out the money plus the contingent right of survivorship.

In Murphy v. Michigan Trust Co., 221 Mich. 243, 190 N. W. 698, it was held the condition that a joint bank deposit should be payable to "either or the survivor" was inconsistent with the idea of a tenancy by the entirety; and that under the Michigan statute (similar to ours) such a bank account would be held by a husband and wife as joint tenants and not tenants by the entirety. The same doctrine is declared in Milano v. Fayette Title & Trust Co., 96 Pa. Super. Ct. 310, and Penna. Trust Co. v. Mischik, 96 Pa. Super. Ct. 255.

In some states the rule is that where one party deposits money in a bank to the credit of himself and another, either or the survivor to draw, the transaction cannot be given effect as an executed gift *inter vivos* to the other, because title does not pass, the condition that either may check out the money being equivalent to a reservation of title and control by the donor—which necessarily means a withdrawal of the money by the donor would operate as an appropriation thereof to his own use authorized by the terms of the deposit agreement. [See Garland's Appeal, 126 Me. 84, 94, 136 Atl. 459; Rice et al. v. Bennington Co. Sav. Bk., 93 Vt. 493, 502, 108 Atl. 708; 48 A. L. R. p. 199, note; L. R. A. 1917C, p. 564, note.]

And in N. J. Title Guar. & Trust Co. v. Archibald, 91 N. J. Eq. 82, 84, 108 Atl. 434, where a mother and daughter deposited money stipulating with the bank in writing that the account should belong to them as joint tenants, either or the survivor to draw, it was held the transaction amounted to a contract that the *"undrawn"* (italics ours) moneys should belong to the daughter, she surviving the mother. The evidence did not show whether either of the parties drew on the account prior to the mother's death.

We shall not review further the cases from other jurisdictions, but there are three Missouri decisions that should be noted: Commonwealth Trust Co. v. Reagan, 193 Mo. App. 290, 183 S. W. 1137; Ball v. Mercantile Trust Co., 220 Mo. App. 1165, 297 S. W. 415; Miss. Valley Trust Co. v. Smith, supra, 320 Mo. 989, 9 S. W. (2d) 58. All three bear on the question as to the right of the surviving joint tenant to take the *balance on hand* at the death of his cotenant. The first, the Reagan case, was decided before our statute was enacted and holds such a transaction was a valid gift notwithstanding the account was "payable to either or the survivor." It is not clearly ruled, however, that this form of account will permit the donor to withdraw and appropriate the money to his own use. In the Ball case the gift was sustained, though the court said it gleaned from the record that the donor wanted his cotenant to have sole ownership of the fund on hand at his death, and yet himself desired to be able to draw from the account during his lifetime "if he needed any of it."

The Ball case and the Smith case both apply our statute. In the Smith case decided by this court, the opinion says although the donee "was authorized and empowered to withdraw the whole, or any part, of the joint account . . he only withdrew from the account the paltry sum of $80 during the several years of (its) continuance." The court was discussing in that connection the evidence bearing on the donee's good faith and innocence of undue influence, and the inference to be drawn from the language is that he could have drawn out more and appropriated it to his own use. The case quotes from the Ball decision and agrees with it in holding that under the statute the form of the account only raises a presumption of joint ownership, which may be rebutted by parol evidence. It is further held, in harmony with the decisions in New York and other states, that the burden of proof is on the donee to prove his joint interest.

We are not prepared to say our statute changed the law so far as pertains to the subject under discussion. Taking a common sense view of the matter, if a husband and wife have a joint bank account, either or the survivor to draw, and therefrom he buys a suit of clothes or an automobile, or she a dress or some jewelry, it would seem forced and unnatural to say the purchaser becomes a trustee for the other spouse as to a joint interest in the property. An accounting of the multitude of transactions that would arise in the family relation would be complicated indeed. The very fact that each is given the separate right to draw on the account would seem equivalent to a sort of standing permission to appropriate parts of the fund from time to time, especially considering the provision in the statute giving either party the right to terminate the drawing privilege by giving notice to the bank.

On the other hand the arrangement is loose and affords opportunity for injustice and overreaching. And logically if the parties have a joint interest in the bank account they ought to have a like interest in property in which the joint funds are invested—nothing further appearing. In our opinion the rule announced in the New York case, Moskowitz v. Marrow, supra, 251 N. Y. 380, 167 N. E. 506, is correct and best fits the peculiar relation created by a banking arrangement of this character. That rule is, as we have stated, that the joint form of the account, either or the survivor to draw, of itself alone raises a presumption of fact, or inference, that the joint interest of the depositors follows funds withdrawn by either and negatives the idea that such withdrawals were severed from the joint estate and appropriated by the drawer to his own use. But the presumption is a weak one and readily yields to parol proof of the real intention of the parties. And while it makes a prima-facie case for the party asserting the joint interest, the burden of proof is on him to establish his title by a preponderance of all the evidence.

In this case the testimony elicited from the appellant without objection went little further than to show a joint bank account existed and that the undertaking equipment was purchased therefrom. The mother's testimony that she earned most of the money must be disregarded. And as against the prima-facie case thus made there is the undisputed record evidence furnished by the articles of incorporation, sworn to by the mother, that the father had fifteen shares of the stock of the Undertaking Company when it was incorporated, followed by the further undisputed evidence that this same stock was inventoried and sold by her to herself as a part of the father's estate. Granting this record evidence was not conclusive against her as a matter of law, it was at least sufficient to overcome her prima-facie case based on the fact that the bank account was joint, or, if not that, it showed the appropriation of the undertaking equipment by the father to the extent of paying for his fifteen shares of stock therewith, was with her knowledge and consent. Indeed it was their joint act. We do not think the mother meets the burden of proof on this issue. [Yates v. Richmond Trust Co. (Mo. App.), 220 S. W. 692; Zahner v. Voelker (Mo. App.), 11 S. W. (2d) 63.]

III. The next point made by the respondents is that even though the mother failed to prove she owned all the corporate stock as tenant by the entirety, yet her purchase of the fifteen shares at the administratrix's sale coupled with the long acquiescence of the appellant in that proceeding, makes her the owner of them now, especially the 7½ shares acquired through the sale. This raises two questions: was the sale

void or voidable at the instance of the appellant; and is he barred by his contemporaneous and subsequent conduct from questioning the force and effect of the sale now.

It is unquestionably the law that a purchase of personalty by an administrator at his own sale is voidable at the instance of the heirs or parties interested. [24 C. J. sec. 1592, p. 636; Bopst v. Williams, 287 Mo. 317, 334, 229 S. W. 796, 801; Gilmore v. Thomas, 252 Mo. 147, 155, 158 S. W. 577, 578; Benson v. Benson, 97 Mo. App. 460.] Until the sale is set aside he holds title as trustee for the interested parties, and they may elect to ratify the sale and hold him as such trustee. [24 C. J. secs. 1593-4, p. 637.]

But if the adverse claimants participate in the sale or fail to make objection within a reasonable time thereafter, they may be held to have ratified it or to be estopped. [24 C. J. sec. 739, p. 219, sec. 1594, pp. 636-7, sec. 1794, p. 710.] Therein lies the crux of this case. There is no question but that the appellant took a part in the probate sale and knew of its effect. And afterward he consented to a rearrangement of the stock certificates and worked for the undertaking company as an employee for about ten years without complaint on that score. Does this shut him out? Ordinarily it would, but we think it does not under the facts of this case.

When the sale occurred he was about 22 years old and his mother was a woman of strong mind and good business ability, as the evidence abundantly shows. The sale was held under unusual circumstances. It was made to order. A large demand was made up and probated by the undertaking company bearing the father's name for his own funeral expenses, and the sale was made privately to the mother in a very informal way. Her counsel say in their brief it was to quiet her title, but it is evident that if the sale was intended to be adverse to the appellant's interest the fact was not disclosed to him.

Both the mother and son were acquisitively inclined. and from the whole record we cannot escape the conviction that she gave him assurances as to his future interest in the business during the years of his connection therewith. He had a natural right to look to it for patrimony and it is difficult to believe he would have foregone his inheritance as long as he did and have been so active in the enterprise if he had not received some promise. We have already held the evidence for appellant along this line does not measure up to the high standard necessary to establish an express trust; but we think it sufficient to preponderate on the issue that his delay was excusable and that he did not ratify the probate sale in the sense of permanently renouncing his own interest in his father's estate. The mother, herself, admitted to her attorney that she might have said to the appellant "When I get a certain amount of money I will let you

have the business." In this respect the case is somewhat like Mc-Farland v. McFarland, 278 Mo. 1, 16, 211 S. W. 23, 27, where a widow was deterred by an arrangement between her and the heirs from bringing her suit for the assignment of dower until after the Statute of Limitations had run. [See also Rollestone v. Natl. Bank of Commerce, 299 Mo. 57, 76, 252 S. W. 394, 400; 21 C. J. secs. 240, 241, p. 243.]

In addition to all of the above the respondents did not plead estoppel, ratification or laches, which they should have done since these were affirmative defenses. [Grafeman Dairy Co. v. Northwestern Bank, supra, 315 Mo. 1. c. 858, 870, 288 S. W. 1. c. 362, 368; Hecker v. Bleish, 319 Mo. 149, 172, 3 S. W. (2d) 1008, 1018.] Respondents have referred to several earlier cases as authority for the proposition that laches need not be pleaded, but they are not in line with the Hecker case and the later decisions there cited. Whether there are exceptions to the rule when the plaintiff's bill on its face, or his evidence, shows laches is a question not raised by the facts in this record.

When the mother purchased the father's fifteen shares of stock at the administratrix's sale she paid for it by causing the corporation's funeral bill against the estate to be receipted and cancelled. In other words, she used the corporate assets to buy the stock for herself. By the articles of incorporation she owned three shares of stock in her own right and she had an equitable or beneficial interest in 7½ shares for her dower, making 10½ shares in all out of the twenty shares into which the capital stock was divided. The son had the two shares allotted to him by the articles of incorporation plus 7½ shares as heir, making 9½. The mother therefore had a beneficial interest of twenty-one-fortieths in the corporation and the son nineteen-fortieths. The fifteen shares of stock bought at the administratrix's sale should be divided on that ratio, giving the appellant 7.125 shares. Between February 2, 1924, and December 28, 1925, the corporation paid $12,000 in dividends. On the basis of his stockholdings of 7.125 shares plus two shares the son should have received 73/160 of these dividends, amounting to $5475. According to the evidence he got only $3,000. He is therefore entitled to $2475 additional, which, in the circumstances, we think should be without interest.

Accordingly, the decree of the circuit court is reversed and the cause remanded with directions to enter a decree adjudging the appellant to be the owner of 9.125 shares of the capital stock of the Wm. Ambruster Undertaking Company, and that the title to so much of said stock be divested out of the respondent Edith E. Ambruster and vested in the appellant Robert J. Ambruster; and that a proper certificate for said amount of stock be issued to the

appellant by the respondent Wm. Ambruster Undertaking Company; and that the appellant have and recover from the respondent Edith E. Ambruster the sum of $2475, and his costs. *Lindsay* and *Seddon*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.