BERTHA A. BUNKER V. FIDELITY NATIONAL BANK AND TRUST COMPANY ET AL., OLIVE E. MICHELSEN, Executrix of Last Will and Testament of WALTER A. BUNKER, Appellant.—73 S. W. (2d) 242.

Division One, June 12, 1934.*

*NOTE: Opinion filed at September Term, 1933, April 19, 1934; motion for rehearing filed; motion overruled at May Term, June 12, 1934.

*Porter B. Godard* and *Beardsley & Beardsley* for appellant.

*Charles M. Bush* and *Roy W. Crimm* for respondent.

308

FERGUSON, C.—This suit involves the right to possession and title and ownership of certain unregistered United States Government Bonds in principal sums aggregating $21,150. The bonds were deposited, for sake-keeping, by W. A. Bunker with the New England National Bank and Trust Company of Kansas City. After the death of W. A. Bunker the New England National Bank and Trust Company merged and consolidated with defendant Fidelity National Bank and Trust Company (of Kansas City) whereupon the bonds so deposited with the New England National Bank and Trust Company came into the possession of the defendant Fidelity National Bank and Trust Company and were held by it under the terms and

conditions governing the deposit thereof by Bunker with the New England National Bank and Trust Company. The bonds were deposited as the property of "W. A. Bunker or Bertha A. Bunker or Survivor." After the death of W. A. Bunker, Bertha A. Bunker made demand upon the defendant Fidelity Bank and Trust Company for the bonds so deposited and then held by it. The demand being refused she filed an action in replevin against the Fidelity Bank and Trust Company to recover possession of the bonds, alleging that she is the owner and entitled to the possession thereof and that defendant trust company "wrongfully detains same." The defendant trust company filed its answer and cross-bill admitting that the bonds described in plaintiff's petition had been originally deposited by W. A. Bunker with the New England Bank and Trust Company; that receipts, verified copies of which were attached, had been issued therefor and that said bonds were held by it; but states that "Olive E. Michelsen, as executrix of the estate of Walter A. Bunker, deceased, claims to be the owner and entitled to the possession of said" bonds "which claim is adverse and directly opposed to the claim of plaintiff who claims to be the owner and entitled to the possession" thereof. By its answer and cross-bill the trust company disclaims any title to or interest in the bonds, except that it holds them for safe-keeping only, and avers that it "is ready and willing to deliver them to the rightful owner;" asks that the executrix be made a party to the action and that the court "adjudge and determine" as between the adverse claimants, Bertha A. Bunker and the executrix, which is the "rightful owner of and entitled to the possession of" said bonds and "direct" it "to dispose of" same accordingly and that it be discharged. The executrix was made a party defendant. Following a judgment of interpleader the plaintiff Bertha A. Bunker and defendant Olive E. Michelsen, executrix, filed appropriate pleadings each claiming ownership and right to possession of the bonds held by the trust company. Trial of that issue, thus framed, was had before the court, without a jury, and the finding and judgment of the court was for the plaintiff Bertha A. Bunker; the executrix has appealed.

Walter A. Bunker was a resident of Kansas City. He owned large and valuable property interests, in the form of numerous parcels of real estate, bonds, stocks and other securities and cash. In 1921 the New England National Bank (later the New England National Bank and Trust Company) offered to receive from its depositors United States Government bonds for safe keeping, collect the interest thereon as it became due and deposit same to the depositor's account. Bunker owned a number of unregistered United States Bonds of various issues and in varying amounts. Pursuant to the offer of the New England Bank he deposited some of these unregistered bonds, the principal sums thereof aggregat-

ing $26,200, with the bank, for safe keeping, as the property of himself and wife, causing the receipts therefor to be issued to "W. A. Bunker or Sarah B. Bunker or Survivor." Plaintiff married Irving L. Bunker, a son of Walter A. Bunker, in 1895. They lived together as husband and wife until the death of Irving L. Bunker in 1926. Five years after the marriage, i. e., about 1900, Irving L. Bunker became an invalid, suffering from locomotor ataxia, and continued until his death a helpless invalid. This plaintiff, Bertha A. Bunker, devoted "all her time and attention" during that period, approximately twenty-six years, to the care, welfare and service of her afflicted and invalid husband. Sarah Bunker, the wife of Walter A. Bunker, and mother-in-law of plaintiff, died in August, 1924. It seems that the son Irving (plaintiff's husband) was the only child of the union living at the death of Sarah Bunker. After his wife's death Walter A. Bunker made his home with his daughter-in-law, this plaintiff, and his son and continued to reside at the home of his daughter-in-law until his death, May 31, 1928. As we have noted the son died in 1926. The time is not stated but the fact appears that Bunker purchased a home for his son and daughter-in-law causing the title to be conveyed to and vested in her alone. Some money came to plaintiff from her father's estate and Bunker, a successful and experienced business man, managed and looked after all her business affairs and investments. His attitude toward plaintiff was that of a father to a daughter and he seems to have been much concerned that ample provision be made for her support and security in the event he should precede her in death and to that end it was unquestionably his desire, purpose and intent, clearly and repeatedly expressed and well known, that certain of his investments should be considered and treated as the joint property of himself and plaintiff so that she would take same by right of survivorship in the event she survived him. In this connection we take note of certain industrial stocks, Sheffield Steel stock and Western Oil Refining Company stock mentioned in the evidence. Bunker had invested in these stocks but the amount or number of shares is not stated. None of plaintiff's money was invested in Sheffield stock though apparently he did invest some of her money in the refining company stock along with his own investments in that stock. These stocks were "in the name of Walter A. Bunker and Bertha A. Bunker or the Survivor." Olive E. Michelsen, who as executrix of the will of Walter A. Bunker, deceased, interpleads herein, had been in the employment of Bunker for twenty-four years next preceding his death, as bookkeeper and private secretary. In reference to these stocks she testified that "in making up these stocks, getting the wording correct" he spoke of the arrangement as a joint tenancy. However, he retained these stocks in his possession, collected all dividends thereon and deposited them to his own account. After Bunker's death Miss Michelsen "turned

these stocks over to" plaintiff as her property by right of survivorship. Returning now to the history of the bonds involved, it will be recalled that in 1921 Bunker had deposited a number of unregistered United States Government Bonds with the New England National Bank for safe-keeping causing the receipts therefor to be issued to W. A. Bunker or Sarah B. Bunker or survivor; the aggregate of the principal sums being $26,200. His wife, Sarah B. Bunker, having died in 1924 and his son in 1926, we find that on May 6, 1927, Bunker went to the New England National Bank and Trust Company, the successor of the New England National Bank, and changed the form of receipts covering the bonds then held by the trust company. He presented the receipts which he held for these bonds issued to "W. A. Bunker or Sarah A. Bunker or Survivor" and directed that new receipts be executed covering these bonds as the property of himself, Bertha A. Bunker or the survivor, and that the receipts be to W. A. Bunker or Bertha A. Bunker or survivor. The clerk in charge of that department testified that the receipts "were made out as he instructed." Five new receipts numbered 37, 38, 39, 40 and 41 were issued. Each receipt reads: "Received of W. A. Bunker or Bertha A. Bunker or Survivor the following described United States Government Securities for safe keeping, having a face value of . . . and all subsequent coupons attached;" the numbers, denominations, etc., of the bonds covered by the receipt followed. The receipts were signed by the vice president of the trust company. The face value of the bonds as stated in each receipt is;

| | |
|---|---:|
| No. 37 | $ 750 |
| No. 38 | 5400 |
| No. 39 | 2650 |
| No. 40 | 14400 |
| No. 41 | 3000 |
| Total | $26,200 |

On the same date and time and as a part of the same transaction he deposited certain unregistered United States Government Bonds belonging to plaintiff and directed and caused the receipts therefor to be issued to "Bertha A. Bunker or W. A. Bunker, or Survivor." These receipts numbered 33, 34, 35, 36, each reads: "Received of Bertha A. Bunker or W. A. Bunker or Survivor" and otherwise were in the same form as the receipts above described. The face value of the bonds as stated in each of these receipts is

| | |
|---|---:|
| No. 33 | $ 700 |
| No. 34 | 350 |
| No. 35 | 2000 |
| No. 36 | 500 |
| Total | $3550 |

Plaintiff testified that she knew of all these deposits but her testimony was limited to that bare statement; she was not permitted to, state what agreement, if any, or understanding existed between her and her father-in-law in reference to any of these bonds. Bunker maintained a safety deposit box in his own name and one in plaintiff's name at the Pioneer Trust Company. He had a key and unrestricted access to, and apparently control of, the box carried in plaintiff's name. Bunker handed all the receipts to Miss Michelsen and she put the receipts numbered 33 to 36 inclusive, wherein the name Bertha A. Bunker appeared first, in the box carried in plaintiff's name and the other receipts, numbered 37 to 41 inclusive, in which the name W. A. Bunker appeared first, in his box. Upon collecting the interest on the bonds the trust company credited interest collected on the bonds covered by the receipts in which the name W. A. Bunker was first to his account and that from bonds covered by the receipts in which the name Bertha A. Bunker was first to her account. The record is silent as to whether this was done pursuant to the direction or instruction of the parties or pursuant to the custom of the trust company or the opinion of its officers as to the manner in which the interest should be apportioned. On January 30, 1928, the bonds of a face value of $2650 described in receipt No. 39 to "W. A. Bunker or Bertha A. Bunker or Survivor" and the bonds of a face value of $350 described in receipt No. 34 to "Bertha A. Bunker or W. A. Bunker or Survivor" having matured or been called, Bunker presented the two receipts and instructed the trust company to get new bonds, "three one thousand dollar bonds" to replace the bonds described in the two receipts and at that time remarked: "They (the bonds) are all daughter's and mine." By the term "daughter" he referred to plaintiff and upon the whole record the inference is not far-fetched that he not only referred to the bonds represented by two receipts numbered 34 and 39 which he then exchanged for three $1000 bonds but to all the bonds he had deposited with the trust company under the series of receipts described. The bonds for $2650 represented by receipt 39 and those for $350 represented by receipt 34 were, as requested, exchanged for three one thousand dollar bonds. Bunker then deposited the bonds for $3000 with the trust company for safe keeping and a receipt therefor numbered 408 was issued, pursuant to his instructions, to "W. A. Bunker or Bertha A. Bunker or Survivor" describing the three one thousand dollar bonds and otherwise corresponding in form to the prior receipts. On July 6, 1927, Bunker presented receipt No. 38 (to W. A. Bunker or Bertha A. Bunker or survivor), for bonds of a face value of $5400, withdrew the bonds covered by that receipt, sold same through bond brokers and applied the proceeds upon the payment and discharge of a mortgage or deed of trust against the residence property, heretofore

mentioned, which he had purchased as a home for plaintiff and his son with title thereto vested in plaintiff, and where he resided and made his home after the death of his wife. So at the time of Bunker's death the bonds held by the trust company in which his name was first in the joint receipts issued were covered by receipts in aggregate principal amounts respectively as follows:

| | |
|---|---|
| No. 37 | $ 750 |
| No. 40 | 14400 |
| No. 41 | 3000 |
| No. 408 | 3000 |
| Total | $21,150 |

These are the bonds in controversy. The executrix made no claim to the other bonds deposited by Bunker under receipts 33, 35, and 36, remaining on deposit at his death, in which receipts the name Bertha A. Bunker appeared first, and the bonds described therein were delivered to plaintiff. Walter F. Norris, sales manager of the Bond Department of the Fidelity National Bank and Trust Company, testified that he was a friend of Bunker and sold stocks and bonds for him; that he knew of this group of bonds in controversy and the manner in which Bunker had deposited them at the New England National Bank as the property of himself and wife; and that in 1927 and 1928 Bunker had referred to these bonds in the course of discussions concerning certain stocks (evidently the Sheffield and refining company stocks above mentioned) which he (Bunker) wanted to place in the name of himself and his daughter-in-law jointly with right of survivorship and at such times Bunker stated that he had changed the bonds which he had originally deposited for safe keeping in the New England Bank with "right of survivorship" in his wife "to the right of Bertha A. Bunker, survivor, so that she (Bertha A. Bunker) would be taken care of if anything happened to him," and that "he had these Liberty Bonds in the New England Bank in joint ownership or under joint receipt for himself and Bertha A. Bunker when anything happened to him." A logical and reasonable inference arises from this witness's testimony that in depositing the bonds under receipts therefor in effect designating them as the property of "W. A. Bunker or Bertha A. Bunker or Survivor," Bunker intended to create, and believed he had effectually created, a joint tenancy in the bonds with the attendant right of survivorship and desired to likewise create a joint tenancy in the particular stocks. It will be recalled that Miss Michelsen testified that Bunker spoke of the manner in which the stock certificates were finally made out as creating "a joint tenancy." The receipts covering the bonds had been changed so as to substitute the name of Bertha A. Bunker in lieu of the name of his deceased wife prior to the time Bunker decided to create the joint tenancy in cer-

tain selected stocks and it seems apparent that he wished to do with these particular stocks as he had done with the bonds which he had deposited with the trust company. Eleanor McKeown testified that she was well acquainted with Bunker; "had a great many conversations with him;" that in January, 1928, she was one of a party or group which made a trip from Kansas City to several points in Texas and return; that Bunker was also a member of the party and that at that time Bunker told her of his desire to care and provide for his daughter-in-law and in that connection told her he had left approximately $20,000 in bonds with the New England Bank "and the receipts were in The Pioneer Trust" and that "he left them (the bonds) to W. A. Bunker, Bertha A. Bunker or survivor." The plaintiff offered the deposition of Miss Michelsen. The deposition went quite fully into her testimony given in an inheritance tax hearing shortly after Bunker's death. She admits in the deposition and again as a witness at this trial that she stated in her testimony in the inheritance tax proceeding that Bunker told her that his "purpose" in having the receipts covering these bonds now in controversy changed to read "W. A. Bunker or Bertha A. Bunker or survivor" was "to create a joint estate in that way." The substance of her testimony in this trial was that Bunker did not at any time talk to her about what he was going to do with these bonds or what his intention or purpose was in reference thereto; that he did not discuss with her, or talk about, the receipts taken or the effect thereof; that he merely handed her the receipts and told her to put them in the safety deposit box; and that he was "constantly providing for" Mrs. Bertha Bunker. In her interplea the executrix states that no specific bequest or disposition of these bonds was made or attempted by the will of Walter A. Bunker. Though occasional references to various provisions of the will are made it seems the will was not offered in evidence and it does not clearly appear whether any provision is made therein for this plaintiff and while the implication is that the will does make some bequests of specific property it is admitted, as above noted, that the will makes no specific reference to or disposition of these bonds. Some idea of the value of the estate is indicated by the fact that though administration has not been completed the executrix had collected fees, prior to the trial of the case, in the amount of $15,500.

Appellant's contention here can be resolved to this, that the trial court "erred in not finding" for the executrix under the facts; that the bonds in controversy were "the property of W. A. Bunker;" that he placed them "for safe keeping only," with the bank, taking receipts therefor and that the bonds "remained in that condition until his death" and "appellant is the executrix of his estate;" that "there was no evidence that Mr. Bunker at the time he took the receipts had any purpose to part with any

right or interest" in the bonds or "to vest any present right or interest" therein "in respondent;" and that "there was no evidence that prior to the death of W. A. Bunker respondent made any acceptance of any act or gift on the part of W. A. Bunker for her benefit or had any knowledge, in fact, of any such act on his part and, in fact, no such act had been by him performed.

As sustaining her position plaintiff cites the provision in Section 5465, Revised Statutes 1929, that:

"When a deposit shall have been made by any person in the name of such depositor and another person and in form to be paid to either, or the survivor of them, such deposit thereupon and any additions thereto made, by either of such persons, upon the making thereof, shall become the property of such persons as joint tenants, and the same, together with all interest thereon, shall be held for the exclusive use of the persons so named, and may be paid to either during the lifetime of both, or to the survivor after the death of one of them; and such payment and the receipt or acquittance of the one to whom such payment is made, shall be a valid and sufficient release and discharge to said trust company for all payments made on account of such deposit prior to the receipt by said trust company of notice in writing signed by any one of such joint tenants, not to pay such deposit in accordance with the terms thereof."

That section is a part of Article 3, Chapter 34, relating to trust companies and the identical provision is found in Section 5400, Revised Statutes 1929, which is a part of Article 2, Chapter 34, relating to banks. It has been held that the statute gives "rise to a presumption that a deposit made within its purview becomes the property of the depositors as joint tenants, and, in the absence of competent evidence to the contrary, actually fixes the ownership of the fund in the persons named as joint tenants with the attendant right of survivorship." [Murphy v. Wolfe, 329 Mo. 545, 45 S. W. (2d) 1079; Ambruster v. Ambruster, 326 Mo. 51, 31 S. W. (2d) 28; Mississippi Valley Trust Company v. Smith, 320 Mo. 989, 9 S. W. (2d) 58.] Appellant argues that the deposit of these bonds for safe-keeping is not such a deposit as comes within the purview of the statute. [2] We deem it unnecessary in this case to rule that question for disregarding the statute as not applicable and considering the facts of the case without the aid of such statutory presumption we are of the opinion that plaintiff sustained the burden of proof devolving upon her and that there is sufficient substantial evidence to sustain the finding in her favor. In reviewing the evidence, supra, we have noted certain facts and circumstances and reasonable inferences tending to show, and we think the evidence as a whole sufficiently does so, that by his act in having the receipts covering the bonds in controversy drawn in the form and manner in which he directed and caused them to be issued it was Bunker's purpose and

intent to thereby establish and evidence a joint ownership or joint tenancy in the bonds with the attendant right of survivorship nor do we find anything in his attitude or conduct in reference to these bonds after he deposited them as the property of "W. A. Bunker or Bertha A. Bunker or survivor" inconsistent with that conclusion. The question as to joint ownership or joint tenancy in the bonds must be determined upon the evidence touching Bunker's intention in directing and causing the receipts evidencing ownership and control thereof to be drawn and issued in the form he did. [Murphy v. Wolfe, supra.] Bunker evidently knew the legal effect of a joint tenancy. He concededly effected a joint tenancy in the Sheffield and refining company stocks. The very act of having the new receipts issued and the wording which he caused to be used is strongly indicative of his intent and it is sufficient to sustain plaintiff's claim of ownership if the evidence clearly shows, as we think it does, that Bunker "intentionally and intelligently created a condition embracing the essential elements of joint ownership and survivorship." It will be recalled that having placed the bonds under a form of receipt, the wording of which he directed and dictated, indicating joint ownership he did not thereafter withdraw or disturb the bonds, except as we shall presently note, and permitted the trust company to continue to hold them under that receipt and such was the situation which existed at his death. It is true he withdrew one lot of bonds, covered by receipt numbered 38, of the face value of $5400 yet when we consider that he acted for and represented his daughter-in-law in all business matters and that the proceeds derived from the sale of those bonds were applied upon the discharge of the deed of trust against her home and for her benefit that circumstance is not inconsistent with the joint ownership. Nor in the light of the facts of this case, the relationship existing between Bunker and his daughter-in-law and that he had control of and managed all her business affairs and all her investments, or investments made in her behalf, is the fact that he retained the receipts in his possession significant. In Commonwealth Trust Company v. DuMontimer, 193 Mo. App. 290, 183 S. W. 1137, the Court of Appeals quoted with approval the following from the 14 Am. & Eng. Ency. of Law: "Where one person gives to another a joint interest in property with himself, no delivery to the donee is necessary, the possession of the donor being also that of the donee. . . . Similarly where a man deposited money in a savings bank to the credit of himself or wife, or the survivor, it was held that this created a joint ownership of the fund, and that the wife was entitled to it after the husband's death as a gift from him, although she had never had possession of the pass book during his life."

The DuMontimer case was decided before the enactment of the statutes above cited relating to a joint deposit in a bank or trust

company. In that case it was held that a savings bank depositor having requested that his savings account be changed to a joint account in favor of himself and another, which was done, there was a complete gift of a joint interest in that account entitling the donee, who survived the donor, to the fund, although the donor had at all times retained the pass book, which under the rules of the bank, was required to be presented when an amount was withdrawn. In re Estate of Martin, 219 Mo. App. 51, 266 S. W. 750, is in point here. In that case John Martin purchased two notes from Bartlett Brothers Land Company, the payee in the notes; one note was in the principal sum of $1000, and the other in the principal sum of $2000. The notes were assigned or endorsed by the land company to the purchaser John Martin, by proper form of assignment or endorsement, upon a "separate slip of paper" attached to each note. John Martin continued to hold the notes and some four years after the purchase thereof caused the assignment or endorsement first made to be detached or removed from the notes and upon his request and at his direction the land company executed new endorsements which were attached to the notes in lieu of the original endorsements. By the new endorsements title to the $1000 note was assigned "to John Martin or Leon J. Martin or to the survivor" and title to the $2000 note was assigned to "John Martin or Mary E. Panigot or Cecelia Nunenkamp or the survivor." The other parties named in the new endorsements were children of John Martin. The actual custody and control of the notes was at all times retained by John Martin. He kept them in a "private box" and collected all interest thereon until his death. So far as appears his children named in the endorsements did not know of the manner in which he had caused the endorsements to be made. Upon the death of John Martin, his son Leon J. Martin (named in the endorsement made of the $1000 note) as executor of the estate "took possession of his father's private box" and found the two notes endorsed as aforesaid. He refused to inventory the two notes as assets of the estate, retained the $1000 note, claiming it as his own property, and delivered the $2000 note to his sisters Mary Panigot and Cecelia Nunenkamp, who claimed same as their property. Thereupon a proceeding was begun in the probate court to have the two notes inventoried as property of the estate. It was held that a joint tenancy was created with right of survivorship and that the children named in the endorsements having survived the father took title to the notes. The DuMontimer case is cited and it is pointed out that no form of actual delivery of the notes to the other joint owners was necessary. The possession of the notes by John Martin being also that of the other joint owners.

Coming now to the proposition that there is no evidence of an acceptance on the part of Bertha A. Bunker. We think it a

reasonable inference that Bertha A. Bunker did know, was fully cognizant of and acquiesced in the arrangement or provision thus made by her father-in-law to her benefit. She was permitted to testify that she knew about the deposit of these bonds in controversy and though her testimony was so restricted nevertheless the reasonable inference is that she knew and fully understood the manner in which these bonds were deposited as well as the bonds which were referred to as being owned by her, and which were deposited at the same time and under the same form of receipt and which also remained in the custody of the trust company until Bunker's death, and acquiesced in and consented to the arrangement. It is not unreasonable to conclude that there was a complete and mutual understanding concerning the provision thus made for Bertha A. Bunker for if the evidence clearly established any fact it is that it was Bunker's purpose and desire that these bonds be the property of his daughter-in-law in the event she survived him and he made no specific disposition of the bonds by his will. However, since a joint interest in the bonds involved was conveyed to or conferred, by Bunker, upon his daughter-in-law as a gift and such gift imposed no burden upon her, and was entirely beneficial, acceptance, if that be a necessary element, will be presumed. [Gosney v. Costigan, 326 Mo. 1215, 33 S. W. (2d) 947; Jones v. Jones (Mo. App.), 201 S. W. 557; In re Estate of Martin, supra; 28 C. J. 695.]

Complaint is made as to the competency of the testimony of Norris and Miss McKeown as to statements made by Bunker after he had deposited the bonds, and taken the receipts, tending to show his intent and purpose as of that time but we think these admissions or statements against his interest were competent. [Cape County Bank v. Wilson (Mo. App.), 34 S. W. (2d) 981, 985.]

Our conclusion is that, upon the evidence adduced, the finding was for the right party and the judgment of the trial court should be affirmed. It is so ordered. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.