ALLEN v. KELSO et al.

No. 43480.

Supreme Court of Missouri.

Division No. 1.

Feb. 8, 1954.

Rehearing Denied April 12, 1954.

Farrington & Curtis, E. C. Curtis, Springfield, Paul Brackley, Buffalo, for Allen.

Don W. Owensby, Theo. G. Scott, Buffalo, for Kelso.

COIL, Commissioner.

Ray E. Allen, plaintiff below, was the husband of Frata Kelso Allen. On September 17, 1949, Ray and Frata Allen conveyed real estate held by the entirety to defendants, who are Frata's brother and his wife. On the same. day, defendants conveyed the property back to Frata Allen. On June 28, 1950, Frata Allen conveyed the property to defendants reserving a life estate.

On September 17, 1949, Ray and Frata Allen also held as tenants by the entirety cash in the sum of $4,629.89, in a joint checking account. On September 20, 1949, Frata Allen withdrew the total amount from the checking account and redeposited that sum in the same bank in a checking account in her individual name. On June 26, 1950, she withdrew the then balance ($3,989.29), admittedly a part of the money which had previously been in the joint account, and redeposited that amount in a joint tenancy account in the names of herself and defendant Guy Kelso. After the death of Frata Allen on July 8, 1950, defendant Guy Kelso received the amount of $3,262.73 remaining in the joint account.

Plaintiff sued to set aside the deeds and to recover a money judgment against defendant Guy Kelso in the amount of $3,-

989.29 on the ground that on September 17, 1949, he was insane and lacked mental capacity to execute the deed or to contract. Plaintiff alternatively sought to be declared the owner of an undivided one-half interest in the real estate and a money judgment against Guy Kelso equal to one half of the $3,989.29 joint account on the ground that the conveyances by Frata Allen to defendants, or either of them, were made in contemplation of death and without consideration, and for the purpose of defrauding plaintiff of his marital rights.

Defendants contended below that plaintiff was not insane on September 17, 1949, and had sufficient mental capacity to convey the real estate; that his conveyance of said real estate was made pursuant to an agreement with his wife whereby they would separate and divide their joint property; by the terms of which agreement his wife was to receive the real estate and the money on deposit in the joint account, and she was to release to him her interest in a certain $5,000 joint note and in the family automobile.

The trial court made neither findings of fact nor conclusions of law. Its judgment was: "(1) On Count I, Plaintiff is decreed to be the owner of an undivided one-half interest in the real estate therein described; (2) on Count II, judgment for Defendant; (3) on Count III, Judgment for Plaintiff and against Defendant in the sum of $1981.28." (Count II, seeking recovery of certain personal property, is not presently involved.)

Both parties appealed. Plaintiff-respondent-appellant contends that the court erred in refusing to declare him to be the owner in fee simple of the real estate and in failing to enter judgment against defendant Guy Kelso for $3,989.29. Defendants-respondents-appellants contend that the trial court erred in granting plaintiff any relief.

It is apparent that, as a basis for the judgment entered, the trial court necessarily found that on September 17, 1949, plaintiff possessed sufficient mental capacity to have conveyed the real estate and to have in effect conveyed the money in the bank to his wife. We, therefore, first determine whether the trial chancellor's finding on this issue may be sustained.

The Allens were married about 1922, had lived in Iowa until the summer of 1949 when they moved to the home near Buffalo, the real estate here involved. Plaintiff had for some years "carried on an affair" with an Iowa woman and his wife knew of this. The testimony of defendant Guy Kelso was that, shortly after the Allens came to Missouri, plaintiff became dissatisfied and desired to return to Iowa without his wife and, on several occasions during the summer of 1949, expressed to Kelso a desire to deed to his wife the property in which they lived, either give to her or permit her to use the "entirety money" in the joint account, to take the joint note above mentioned and the automobile and return to Iowa without his wife, where, he told Kelso, he had some money and other property. Apparently Allen took no affirmative action to attempt to effectuate these desires until September 17, 1949.

The events of September 17 are disclosed by summaries of the testimony of plaintiff's witnesses Owensby and Hawkins, defendants' witness Butler, and of defendant Guy Kelso.

Don W. Owensby, one of the attorneys representing defendants in the instant case, testified that on September 17 plaintiff came to his office in a nervous and excited condition and talked to him about making a deed, transferring property, making a will, and a property settlement. As the witness began to inquire about those matters, he was informed that plaintiff's wife was down on the street in an automobile and unable to come upstairs. "He (plaintiff) certainly did not have it clear in his mind the manner in which he would effect his purpose. * * * he would keep asking me hypothetical questions—if I were a married man, and if a married man would make a will and then die, what would happen; if he had a property settlement and were to die, what would happen. So, in that manner, he didn't seem clear in his mind what he was trying to say. * * * he had an

impaired hearing, and it made it difficult to talk with him."

"Q. * * * did you advise him that you would not draw any (deeds or other instruments), that you thought it was best that he not write any at that time? A. Yes, sir."

Allen didn't tell him his troubles but he did mention a $5,000 note and a diamond ring which he was wearing, and said that he had an automobile. "As I recall, he seemed to have in his mind the way this thing should go; it was, generally, to leave the property to his wife, * * * I told him that he should go home and talk it over with his wife and decide what he wanted to do." He said he was going to Iowa after the settlement and it was witness' impression that his wife was not to return to Iowa with him.

"Q. Your opinion was that he was not in any mental condition on September 17th, 1949, to make any transactions involving real estate, was it not? A. Well, Mr. Curtis, I did not make it; I did not draw up any papers for him. I don't believe I can testify that in my opinion it was his mental condition that prevented that. The more I inquired about his property, as Attorney, in relationship with our clients, we can read and understand them, and I could understand that he was resenting my inquiries about his property and about what he was trying to do, and there was just something there that I never was able to break down. But I don't believe I could truthfully say it was because of his mental condition. I did observe his nervousness, and that item was probably taken into consideration in my refusing."

Glen Hawkins, in the real estate business, testified that he sold the real property to plaintiff and his wife; on September 17, 1949, plaintiff came to his office in a nervous state, extremely excited, and very emotional; paced the floor, and wanted witness to draw a deed. Plaintiff's talk was not coherent enough for witness to determine what plaintiff wanted. "He wanted me to draw a deed for him, conveying the property, the sixteen acres that they had pur- chased, that he and his wife had purchased, to Frata Allen, his wife; then he decided he didn't want this deed drawn like that, and changed his mind; then he decided, before he left, that he did want to draw the deed, and changed his mind again, and left." The witness refused to draw any instrument for plaintiff. Plaintiff had always been a nervous man, and the witness understood that plaintiff and his wife were having some kind of trouble and knew that she was sitting out in the car and that she was crying. He was a friend of both and didn't want to get mixed up in their affairs. In witness' opinion, plaintiff wasn't capable of making a deed at that time. That's why he didn't draw it. The witness told defendant's counsel the other day that " 'I couldn't say for sure whether he (plaintiff) was crazy or whether he wasn't and I am not trying to say now."

J. C. Butler, 75 years of age, was in the insurance and loan business and did notary work. He testified that on September 17, defendants (Mr. and Mrs. Kelso) and Mr. and Mrs. Allen came to his office, and "they wanted me to write a deed; they said that he was going away, or something, I don't remember now exactly what it was, and he wanted me to write a deed from him to his wife." Mrs. Kelso (defendant) introduced the matter. They were all there and heard what was being said. Witness told them they should make a deed to some third party and let the third party deed it back to Mrs. Allen. He took the Allens' acknowledgments. That was the only transaction he ever had with the Allens and he had never seen plaintiff before that day. Plaintiff seemed to be all right as far as witness could tell, but he didn't pay any particular attention. Not a thing occurred which led him to believe plaintiff was insane, although he had no discussion with plaintiff at that time. Nothing was said about a property settlement. Plaintiff walked around the office part of the time.

Guy Kelso testified that on September 17 he and his wife saw the Allens on the south side of the square; that plaintiff said:

" 'We have come to town, and I am deeding Frata the place, and I am going on to Iowa', and he said 'I am deeding it so everything will be fixed up so I can get gone', and he told me the same thing as he did before, he said 'I am deeding her the place, I am going to deed her the place; the money in the bank is hers, the furniture and everything is hers', and she asked him if he wanted any of that furniture and he said 'No'; he said 'She has got all up there that she needs.' * * *

"Q. Did he tell you whether or not he had seen various parties that day relative to getting the papers fixed up? A. Yes.

"Q. Who did he tell you he had seen? A. He said he went in to Hawkins', and they told him that they didn't care about doing that kind of business; he told me he had been up to Don Owensby, and he asked him a few questions, and he asked him what he owed him and that he said two dollars, and he said 'By God, I wouldn't go back to him'; and he said 'Where do you get your business done', and I said 'Usually Ted Scott or Bud Butler, most of it Bud Butler', and he said 'We will go down there, then.'

"Q. Did you go with him? A. Yes.

"Q. Who all went down to Bud Butler's? A. The four of us, Frata, my wife, and he and I."

Guy Kelso further testified that he didn't remember who told Mr. Butler that they wanted the deed, that Mrs. Kelso might have asked about it; that there was nothing about the conduct of the plaintiff to lead the witness to believe he was a person of unsound mind and insane. "He was just as normal as he could be * * * just like he had always been." He said that when plaintiff didn't "get his way" he would have a tantrum every once in a while and that he was nervous.

After the execution of the two deeds, the Allens went to defendants' home where they spent the night. The next day, the Allens went to their home for the purpose of permitting plaintiff to pack his personal belongings preparatory to returning to Iowa. Some time during the afternoon, plaintiff attempted suicide by hanging and nearly succeeded in taking his life. He was removed in an unconscious condition to a hospital where he remained four days. Upon plaintiff's release from the hospital, Guy Kelso drove him from the hospital to a cabin and placed it under a 24-hour guard. On September 23 (the next day), Guy Kelso filed an information alleging that Allen was insane. On September 29, plaintiff was adjudged to be insane and ordered committed to State Hospital No. 3 at Nevada where he stayed until July 3, 1950, when he was released on "parole"; he was discharged on December 20, 1951. (It is a fair inference from the evidence that the release on "parole" on July 3 was pursuant to Frata Allen's request (who had long suffered from severe arthritis and heart condition, and who then knew that she could not live long) to again see her husband and know that he was on his way to Iowa prior to her death.)

Plaintiff was not present at the trial and his whereabouts and status at trial time are not definitely established. One witness, who resided in Iowa, testified that "He (plaintiff) is at the insane asylum, I understand."

Dr. Paul L. Barone, superintendent of State Hospital No. 3, testified that plaintiff was admitted to that hospital on September 29, 1949, by order of the probate court of Dallas County. The doctor examined plaintiff the following day and diagnosed his condition as involutional psychosis melancholia, which he explained was a form of insanity which sometimes appears following "a change of life, which also happens in men." It was the doctor's opinion that, upon admission to the hospital, plaintiff was insane. He said that this type of insanity does not come on suddenly but usually is a gradual sort of thing. (Plaintiff's Exhibits 9 to 9E, inclusive, were mailed by the doctor to Mrs. Allen on September 29 in an attempt to obtain from her background information concerning the patient, and these exhibits, to which fur-

ther reference will be made, were returned to the hospital by mail some days later.)

Dr. Barone said that, based upon his observation and study of plaintiff at the hospital, and assuming the truth of the statements in Exhibits 9–9E, inclusive, as to the onset of plaintiff's mental illness, and assuming that on September 17 plaintiff went to a notary's office to discuss a business transaction and was highly nervous and excitable and unable to make himself clear and contradicted himself, and assuming that on the following day he attempted suicide, it was his opinion that plaintiff was "probably" or "assumably" mentally ill and of unsound mind on September 17. He further stated that involutional psychosis melancholia does not affect the memory of a person in its *early stages* and that it could be possible that plaintiff knew on September 17 the extent of his property, but that the plaintiff didn't remember things "when we got him"; and that it could be that plaintiff did realize what he was doing in his attempt to transfer the home and some money to his wife and return to Iowa; that plaintiff could have known of the property he owned, the members of his family, and what disposition he wanted to make of his property; but he also said he did not mean that he did know. The witness also testified that, making the assumptions theretofore made in the hypothetical question, and taking into account the matters inquired about by defendants' counsel, he did not believe plaintiff was of sound mind and able to exercise judgment in the disposition of his property on September 17.

It is fairly established by the evidence, we think, that questions appearing on plaintiff's Exhibits 9–9E were answered by Mrs. Allen, plaintiff's wife. Among the questions and answers appearing on those exhibits are these:

"Q. Does the patient complain of any pain or particular disease?" A. He has complained of noises in his ears always saying it sounded like a band playing since his nervous breakdown six years ago."

In answer to a question which referred in point of time to the period six years ago, "What were the symtoms? A. Nervous trouble, talking, walking the floor and crying. Q. Did the patient entirely recover from this previous mental illness? If not, describe the symptoms. A. Very nervous at times."

Under the heading "Social History", the following information appears: "Danger to self. Extreme nervousness two months ago, showed loss of interests, fears, visions, talkative, sad; suicidal idea, careless personal appearance. Memory failure, ate well but restless at night. Showed much interest in another woman (named Edna Johnston of Harvard, Iowa) and didn't seem to be able to decide between us as I have been a semi-invalid for the past two & half years and being of a kind disposition his conscience seemed to (o) great and I feel in his already weakened condition helped to lead up to the present state of conditions. Should this person come to the hospital (Edna Johnston of Harvard, Iowa) please do not admit, and should any letters come from said person please don't deliver them."

The only other bits of evidence which could be said to relate to the mental capacity of plaintiff on September 17 was the testimony of Dr. Claude Gammon, who had attended Mrs. Allen on one occasion, who testified that the fact that one endeavors to take his own life indicates a "mental disturbance" but that one attempting to hang himself one day could, on the day before, have known who his wife was, whether he had children, and the value of his property; and the testimony of a neighbor of plaintiff and his wife who said that plaintiff acted normal "most of the time."

In reviewing this case, we weigh the evidence, taking into consideration the trial chancellor's position to have judged the credibility of the witnesses who appeared before him. McElroy v. Mathews, Mo.Sup., 263 S.W.2d 1. Cancellation of a deed is the exercise of one of equity's most extraordinary powers and such power

should be exercised only where the evidence clearly justifies it. Tweed v. Timmons, Mo.Sup., 253 S.W.2d 176, 178[1, 2]. The burden of proof was upon plaintiff to prove by clear and convincing evidence that on September 17, 1949, he lacked mental capacity to understand the nature and effect of the act in which he was engaged. Schneider v. Johnson, 357 Mo. 245, 254, 207 S.W.2d 461, 466[4]; Farr v. Lineberger, Mo.Sup., 207 S.W.2d 455, 459[2–4]. Mental weakness is not enough to justify setting aside a deed or contract, but the proof must clearly show that plaintiff did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he was engaged. Weakley v. Weakley, 355 Mo. 882, 887, 198, S.W.2d 699, 702[1, 2].

■ We have weighed the evidence in this case. In our view, the issue does not turn upon the credibility of witnesses. The undisputed events in their chronological order, admitted by Guy Kelso and undenied by Mrs. Kelso (who, significantly, did not testify) convinces us that plaintiff did not possess sufficient mentality on September 17 either to contract with his wife to give her the money in the joint account or to execute a deed in an attempt to carry out the terms of any oral agreement he may have made with her. The evidence showed that Mrs. Allen knew that her husband was mentally ill on September 17, 1949, and that one of the symptoms of his mental illness was "loss of memory." In fact, we may fairly deduce, from the evidence that Mrs. Allen was attempting to go along with whatever was necessary to satisfy the whims of her mentally ill husband in the hope that he might recover or be as happy as possible. In any event, the day following the execution of the deed, plaintiff attempted suicide. Both defendants knew of this attempt and both accompanied him to a Springfield hospital where he stayed four days; and Kelso immediately placed him in a cabin and kept him under 24-hour guard. On September 23, only six days after the deed was executed, Kelso alleged that plaintiff was insane, and six days later, the probate court

so adjudged him and committed him to the state hospital where he was found to be insane and to "not remember things." The superintendent of the hospital was of the opinion that if plaintiff's mental illness had had its onset two months prior to the time he examined plaintiff, as Mrs. Allen said it had, plaintiff was of unsound mind and not capable of transacting business on September 17.

The only direct testimony that plaintiff was normal on September 17 was that of Guy Kelso who said that plaintiff was "normal", just like he always was. Subsequent events, however, demonstrated that Kelso's opinion was entitled to little weight, particularly in view of his own solemn allegation a few days later that plaintiff was insane and in view of the fact that plaintiff had spent four of those six days in the hospital recovering from physical injuries inflicted by a suicide attempt.

We take cognizance of the fact that plaintiff did not testify; and that Mrs. Kelso, who apparently did most of the talking at the time the deeds were executed, did not testify. Whether plaintiff was or was not wholly or partially incompetent to testify, we need not determine. If an unfavorable inference may be drawn from his absence and his counsel's failure to offer him as a witness, irrespective of his competency, we think any such unfavorable inference is overcome by the overall factual picture which so clearly appears in the record.

We are of the opinion that plaintiff sustained his necessary burden of proof and showed by clear and convincing evidence, that on September 17, 1949, he lacked mental capacity to contract; and this whether the contract be considered as one involving "bargaining" or as one of voluntary gift. It follows that plaintiff should be declared the owner in fee simple of the real estate.

It also follows that a money judgment should be entered in favor of plaintiff against Guy Kelso; for, if plaintiff lacked mental capacity to contract, he could not validly agree to transfer to or give his wife his interest in the money in the joint ac-

count, admittedly held by the Allens as tenants by the entirety. Mrs. Allen could not, by changing the "entirety" account to one in her individual name and by subsequently depositing the money in a "joint tenancy" account in hers and her brother's names, destroy plaintiff's right to the money which accrued to him by operation of law upon Mrs. Allen's death.

In Ambruster v. Ambruster, 326 Mo. 51, 72, 31 S.W.2d 28, 37, 77 A.L.R. 782, this court said, in speaking of the nature of the relationship created by a bank account owned by husband and wife as tenants by the entirety: "Taking a common sense view of the matter, if a husband and wife have a joint bank account, either or the survivor to draw, and therefrom he buys a suit of clothes or an automobile, or she a dress or some jewelry, it would seem forced and unnatural to say the purchaser becomes a trustee for the other spouse as to a joint interest in the property. An accounting of the multitude of transactions that would arise in the family relation would be complicated indeed. The very fact that each is given the separate right to draw on the account would seem equivalent to a sort of standing permission to appropriate parts of the fund from time to time, especially considering the provision in the statute giving either party the right to terminate the drawing privilege by giving notice to the bank.

"On the other hand, the arrangement is loose and affords opportunity for injustice and overreaching. And logically, if the parties have a joint interest in the bank account, they ought to have a like interest in property in which the joint funds are invested—nothing further appearing. In our opinion the rule announced in the New York case, Moskowitz v. Marrow, 251 N.Y. 380, 167 N.E. 506 [66 A.L.R. 870], is correct and best fits the peculiar relation created by a banking arrangement of this character. That rule is, as we have stated, that the joint form of the account, either or the survivor to draw, of itself alone raises a presumption of fact, or inference, that the joint interest of the depositors follows funds withdrawn by either and negatives

the idea that such withdrawals were severed from the joint estate and appropriated by the drawer to his own use. But the presumption is a weak one and readily yields to parol proof of the real intention of the parties. And while it makes a prima facie case for the party asserting the joint interest, the burden of proof is on him to establish his title by a preponderance of all the evidence."

Defendant, Guy Kelso, relied upon an agreement which he claimed to have made with his sister on June 26, 1950, as we understand, that he would care for and support her for the remainder of her life in exchange for instant real estate and the balance which might remain in her individual account; and that pursuant thereto her individual account was changed to a joint tenancy account in the names of Mrs. Allen and Guy Kelso. It seems clear that this evidence in no way affects or overcomes the "presumption" which negatived "the idea that such withdrawals were severed from the joint estate and appropriated by the drawer to his own use." This evidence had nothing to do with, and did not tend to show, any consent by plaintiff to the appropriation of the "entirety" money to his wife's individual use. The essential fact is that plaintiff never did validly consent that his interest in the "entirety" money be extinguished. See: Feltz v. Pavlik, Mo. App., 257 S.W.2d 214.

As to the amount of the money judgment. The record shows that on September 20, 1949, when Mrs. Allen transferred the money in the "entirety" account to an account in her individual name, the amount transferred was $4,629.89; that on June 26, 1950, when her individual account was changed to a joint tenancy account in the names of Mrs. Allen and Guy Kelso, the amount on deposit was $3,989.29; that on July 8, 1950, the date of Mrs. Allen's death, the amount in the account was $3,262.73, and that Kelso received that amount. Plaintiff does not claim that he is entitled to and does not seek a judgment including the amounts withdrawn by Mrs. Allen prior to her death and used for her living expenses.

There is no showing as to who withdrew the sum of $726.56, the amount withdrawn after the account became a joint tenancy account of Mrs. Allen and Kelso, or for what purpose that money was used. We, therefore, assume that this amount was withdrawn for Mrs. Allen's use and benefit. Accordingly, the money judgment in favor of plaintiff against defendant Guy Kelso should be in the sum of $3,262.73 with interest thereon at 6% per annum from July 8, 1950.

The judgment is reversed and the cause is remanded with directions to enter judgments in accordance with this opinion.

VAN OSDOL and LOZIER, C., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.

On Motion for Rehearing.

PER CURIAM.

In the motion for rehearing the question of the sanity of plaintiff has been raised. There were no suggestions of insanity made at the trial. This case has resulted in the plaintiff receiving all the relief he sought or which it was possible for him to receive. As in the case of an infant appearing by attorney, when a plaintiff is "blest by success" in maintaining his cause, the matter is on a different basis from a situation in which the result is adverse. See, Reineman v. Larkin, 222 Mo. 156, 121 S.W. 307. In an action by an insane person such a favorable judgment is not void. See, 44 C.J.S., Insane Persons, § 141, p. 303, § 151, p. 325; see also, 28 Am.Jur. 735, Sec. 103. If plaintiff now needs protection by representation or guardianship, there is ample judicial and statutory authority for providing such protection.

The motion for rehearing is overruled.