Mary Jane WALTON, Will H. Walton, Mabel Thornton, Virgie Marlin and Chester Walton, Appellants,

v.

Evalena VAN CAMP, James Van Camp, Eula Lindsey and Mamie Cleo Walton, Respondents.

No. 44174.

Supreme Court of Missouri, Division No. 2.

Nov. 14, 1955.

E. C. Hamlin, C. M. Wantuck, Springfield, for appellants.

John B. Newberry, Springfield, for respondents.

STOCKARD, Commissioner.

 This is a suit in equity to set aside a warranty deed to ten acres of land in Greene County, Missouri, made by Walter and Mamie Cleo Walton, tenants by the entirety, to Evalena Van Camp, sister of Walter, on the grounds of mental incapacity of Walter and undue influence on the part of Evalena. The parties will be designated as in the trial court. The plaintiffs are the mother and four brothers and sisters of Walter. The defendants are Evalena, her husband, Eula Lindsey who is a sister of Walter, and also Mamie Cleo. The trial court found against the plaintiffs and this appeal resulted. Title to real estate is involved so this court has jurisdiction.

On May 13, 1950, Walter and Mamie Cleo, in contemplation of divorce, arrived at a property settlement which included an arrangement whereby title to the property in question was to be transferred to Evalena to hold until after the divorce and then she was to transfer title to Walter alone. After execution by Walter and Mamie Cleo, the warranty deed was delivered to Evalena by Walter. Walter and Mamie Cleo were divorced on June 23, 1950.

Evalena admits that at the time she received the warranty deed she understood that she was to transfer the title back to Walter after the divorce. However, she contends that on April 12, 1950, Walter and Mamie Cleo had entered into a contract to sell the property to Mr. and Mrs. Amos Vale, and that while negotiations were being carried on after the divorce to have that contract canceled or to get the Vales not to insist on specific performance, she retained title by agreement with Walter, and that subsequently on November 17, 1950, at the express request and in the presence of Walter, she executed a quitclaim deed, which was prepared by Walter's attorney, conveying the property to Louise Phillips, who then conveyed the property by a quitclaim deed, also prepared by Walter's attorney, to Walter and Evalena as joint tenants with right of survivorship.

The petition challenges only the warranty deed. However the case was tried in the circuit court and briefed in this court on the theory that the validity of all three deeds were challenged.

This is an equity case and we shall review the evidence in considerable detail. Walter had worked as an "engineer and driver" for the fire department of the City of Springfield for about twenty years, and had retired in 1947 on a pension. He was not physically strong, he was nervous and emotional, and he was not in good health after he retired. He had two periods of severe illness. The first occurred in 1949 and resulted in his hospitalization in May of that year at the O'Reilly and later at the Wadsworth Veterans Hospital for a period of several months. The second illness occurred in 1952. He was adjudged to be insane on August 13, 1952, and died intestate on August 19, 1952.

In connection with the alleged mental incompetency of Walter, one or more of plaintiffs' lay witnesses testified that Walter was nervous and "we just couldn't keep his clothes on him," he would take the covers off his bed and pile them in the floor, he "couldn't carry on a conversation," he would cry frequently and readily, he would imagine people were in the room after him, he would see stars, he tried to tear the curtains down and did tear down the telephone stand, his head bothered him a lot, he had difficulty in seeing, he did not always recognize his friends and he had to be fed with a spoon. However, these witnesses were for the most part indefinite, and frequently contradicted themselves, as to when these acts and symptoms occurred. Mrs. Mabel Thornton, one of the plaintiffs and a sister of Walter, testified concerning most of the acts and symptoms mentioned above. On direct examination she stated that "his condition" was constant throughout 1950, including May 1950. But on cross-examination she stated that the acts and symptoms about which she had testified occurred in

1949 before he was hospitalized. She saw Walter in May 1950 and he recognized her, his other relatives and "the family," and she "just couldn't say" if he realized that he was making a deed and was transferring away his property, because she was not present. However, about the time of the divorce, Walter had talked to Mrs. Thornton "about his property," and she testified that "I think he understood what he owned."

Mrs. Virgie Marlin, a sister of Walter and one of the plaintiffs, testified concerning some of the acts and conditions above related, but she stated on cross-examination that they occurred in 1952 or when she helped take care of him "before he went to O'Reilly" which would have been in 1949. She knew nothing concerning the signing of the deeds or whether Walter was "all right" at that time.

W. H. Walton, one of the plaintiffs and a brother of Walter, testified concerning some of the above referred to acts of Walter, but on cross-examination he stated that the "peculiar" acts about which he testified occurred only when Walter was sick.

Several other lay witnesses testified for the plaintiffs, but for the most part their testimony concerned acts of Walter which occurred in 1949 before he was hospitalized or in 1952 shortly before he died, or the testimony was general in nature, such as, he was "queer acting at times" or that he "didn't act right at times." One witness, Mrs. McCully, a neighbor of Walter's mother, testified she saw him cry "before he went to the hospital each time" and also "when he was ill, during the last few weeks he was there," but she testified that he "always" knew her and would call her "Cully." Thomas H. Gideon, Judge of the Magistrate Court, testified that "back two or three years ago" in 1950 or 1951, "it wasn't in '52," Walter told him that he had "made some deeds" and that he was not "in the least bit satisfied about it." Judge Gideon told Walter to bring the deeds to him and he would look at them, but Walter never did so. Judge Gideon testified that at the time of this conversation Walter was "incoherent," and it was his opinion that Walter was "thoroughly incompetent."

The attorney, who drew the warranty deed of May 13, 1950, took the acknowledgment of Walter and Mamie Cleo in his capacity as notary public. He testified that he discussed with and explained to Walter the terms and effect of the warranty deed, and that in his opinion Walter understood the effect of the deed and the nature and extent of the property involved. He "saw no indication at that time that he (Walter) was nervous or high strung."

Dr. Max Fitch treated Walter in 1944 and 1945 for a nervous condition and again in July and August of 1952 for a "mental condition" which he diagnosed as a "cerebral softening, caused by hardening of the arteries." In answer to the question whether this was a progressive disease, he stated that, "It starts the minute you are born." He further stated that when he examined Walter in 1952 his mental competency then was such that he could not understand the ordinary affairs of business, but that he could not say how far previous to 1952 "this hardening of his arteries became of enough consequence to affect his motor functions." Dr. J. M. Sartin, a specialist in neurology and psychiatry, examined Walter on March 13, 1952. His diagnosis was that he had an "organic brain disorder" and he found him "markedly mentally deteriorated, and had evidence of a progressive organic brain disorder," that he was "more or less disoriented in all respects" and that he was "mentally bankrupt, so to speak." When asked for an opinion as to how long Walter had been troubled with the organic disease, he stated: "I would think it would take at least, oh, a minimum of two or two and a half years for a patient to reach such a state. Maybe longer." He further testified that it would be speculative, but he doubted that Walter would have been capable of understanding the situation in which he and his wife obtained a divorce and settled their property, but he also stated that it was possible that two years pre-

vious to the examination he had made, Walter could have understood what his property was, and that there was no way to tell whether or not he was of sound mind at that time.

The testimony concerning undue influence on the part of Evalena was that she was the sister of Walter, that "she took over his affairs when he got his divorce; he turned his checks over to her and she handled his affairs after he got his divorce," and that "she would put it (the money from the pension checks) in the bank and then she would cash it out and pay his bills." Mrs. Thornton stated that she knew that Evalena paid his bills because "me and him and Evalena all three" entered into an arrangement whereby she was to be paid twenty-five dollars a month to take care of Walter, and Evalena signed the checks in payment to Mrs. Thornton for her service. But she testified that she thought Walter understood that Evalena was paying his bills for him and that she was doing so at his direction. After the divorce Walter lived in his own home, or with his mother in Springfield, or on a farm with his sister Eula Lindsey near Springfield. It does not appear that at any time after the divorce he lived with Evalena or she with him.

Defendants' evidence consisted of testimony of lay witnesses. Eula Lindsey testified that Walter lived with her "off and on" during the summer of 1950, and that she saw nothing that would lead her to believe he was a person of unsound mind, but that although he had "a perfect good mind" he was "a very sick man * * * just a nervous sickness." She also stated that during the summer of 1950 he advised her concerning the wiring of her house and later concerning the sale of her farm, and "along about the time he got his divorce" Walter told her that he had the property in question put in Evalena's name and it was to be turned back to him, but later he said, "Well, it has been put in joint names," and "that is just the way I want it." Based on her observation of him, Mrs. Lindsey was of the opinion that in 1950 while he was

with her he was sane, that he knew that he owned the property in question, and that he knew and recognized his relatives and understood how to take care of the ordinary affairs of his business. Her son and a brother-in-law of her son testified that during the summer of 1950 they saw Walter frequently at the farm of Mrs. Lindsey and that he carried on normal conversations and appeared to be of sound mind.

Ray Daniel, an attorney at law, testified that in the latter part of July or early August 1950 Walter told him that previous to his divorce he and Mamie Cleo had entered into a contract to sell the property in question to Mr. and Mrs. Amos Vale, that he really did not want to sell but Mamie Cleo wanted him to, and he did not believe the price to be proper and he wanted to keep the property for his home. Walter then told Mr. Daniel that he was to negotiate with the attorney for the Vales and "get him out of it." As a result of the negotiations the Vales abandoned the contract. Mr. Daniel also testified that on November 17, 1950, Walter and Evalena came to his office and Walter said that he wanted to get the title to the property in question "straightened out," and that the title stood in Evalena's name. Walter stated to Mr. Daniel that he "wanted it so that it could be between him and Evalena, and if he died, it would all go to her. If she died, it would be his, that he couldn't sell it without her permission and she couldn't do anything to it without his." Evalena did not enter into this conversation concerning the disposition of the property. Mr. Daniel prepared the two quitclaim deeds previously referred to and they were executed in the presence of Walter. It was the opinion of Mr. Daniel that when he talked to Walter about the contract with the Vales and concerning the two quitclaim deeds "he was competent and understood the conversation, I thought, beyond any question of doubt."

■ Before considering the merits of the case we must first dispose of several preliminary questions. The trial of the case was held on February 25, 1953. De-

fendants called Ray Daniel as a witness and objections were sustained to most of his testimony on the ground that he was the attorney for Walter and the conversations between him and Walter were confidential. After trial the defendants filed what is referred to in the transcript as a "motion for a new trial," prior to judgment, requesting that the case be reopened and additional testimony be heard." On its own motion the court reopened the case on July 25, 1953, and heard the testimony of Ray Daniel, and on August 29, 1953, it overruled the above referred to motion of defendants and entered judgment for defendants. Plaintiffs contend that defendants' motion to reopen and hear the additional evidence was overruled, and, therefore, the testimony of Ray Daniel given on July 25, 1953, is not before this court. There is no merit to this contention. In its discretion the trial court may reopen an equity case before judgment to hear additional evidence, and there is no indication that the trial court abused its discretion in doing so in this case.

■ Plaintiffs next contend that it was improper to receive the testimony of Ray Daniel because of the "dead man's statute." Section 491.010 RSMo 1949, V.A.M.S., provides that when one of the original parties to a contract or cause of action in issue and on trial is dead or is shown to be insane, the other party to such contract or cause of action shall not be admitted to testify either in his own favor or in favor of any party to the action claiming under him. Ray Daniel is not a party to the cause of action on trial nor was he a party to the transaction involving the quitclaim deeds, and he had no interest in the transaction. His testimony is not barred by the "dead man's statute." Yawitz v. Laughlin's Estate, Mo.App., 68 S.W.2d 830; Mott v. Bernard, 97 Mo.App. 265, 70 S.W. 1093.

■ Plaintiffs also contend that Ray Daniel could not relate his conversations with Walter because he was the attorney for Walter and the communications were privileged. The privilege as to communications between attorney and client exists only in favor of the client, Canty v. Halpin, 294 Mo. 96, 242 S.W. 94, but after the death of the client the privilege can be waived by his representatives. Wilcox v. Coons, 359 Mo. 52, 220 S.W.2d 15. The question of who are the representatives in a case such as this was considered and decided in Wilcox v. Coons, supra. There the suit was between persons claiming as devisees in the grantor's will and persons claiming as grantees in a deed. The devisees under the will had brought suit to set aside the deed, and in behalf of the grantees in the deed the attorney of the grantor testified as to what the grantor told him concerning the terms of the deed. It was held that the grantees in the deed were representatives of the grantor who could waive the privilege. We see no material distinction between that case and the instant case. Here the plaintiffs were heirs at law instead of devisees in a will. The defendant Evalena was the grantee in the deed, and the other defendants were nominal parties only. Wilcox v. Coons cites with approval Thompson v. Ish, 99 Mo. 160, 12 S.W. 510, wherein it was held that in a will contest either the contesting heirs of a testatrix or the proponent devisees in her will would be her representatives and could waive privileged communications between the testatrix and her physician, and that it would be unjust to hold that the privilege belonged to one set of such claimants and not to the other. See also Johnson v. Antry, Mo.Sup., 5 S.W.2d 405; Clark v. Skinner, 334 Mo. 1190, 70 S.W.2d 1094; Canty v. Halpin, supra; Runnels v. Allen's Adm'r, Mo.App., 169 S.W.2d 73. Under the circumstances here Evalena was a representative of Walter and was entitled to waive the privilege. The testimony was properly admitted.

■ There was no consideration for the warranty or quitclaim deeds, and plaintiffs assert that for this reason these deeds are of no legal force and effect. They cite Cook v. Branine, 341 Mo. 273, 107 S.W.2d 28 and Colquitt v. Lowe, Mo.Sup., 184 S.W.2d 420. We agree with the rulings in both cases, but neither controls this case. Both

of these cited cases hold that the lack of consideration and the lack of intent to convey absolute title authorize the intervention of equity on the refusal of the grantee to return the property. As to the warranty deed, there admittedly was no consideration and no intent by Walter to convey absolute title, but the circumstances of the subsequent execution of the two quitclaim deeds take the present case out from the rule of the two cited cases. There was an intent, if Walter was sane, to have an interest conveyed to Evalena by the quitclaim deeds. A voluntary conveyance without any valuable consideration is valid between the parties. Binnion v. Clark, 359 Mo. 202, 221 S.W.2d 214. The plaintiffs claim under Walter as his heirs, and they stand in the same relation to Evalena on this question as did Walter. Ruff v. Young, 354 Mo. 506, 190 S.W.2d 208.

■ The cancellation of a deed is the exercise of the most extraordinary power of a court of equity and this power ought not to be exercised except when clearly justified from a consideration of all the evidence in the case. Platt v. Platt, 343 Mo. 745, 123 S.W.2d 54; Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59.

■ The burden of showing the mental incapacity of Walter rested upon the plaintiffs. Edinger v. Kratzer, Mo.Sup., 175 S.W.2d 807. In reviewing this case we weigh the whole evidence, and we may take into consideration the trial chancellor's position to have judged the credibility of the witnesses who appeared before him. McElroy v. Mathews, Mo.Sup., 263 S.W.2d 1; Allen v. Kelso, Mo.Sup., 266 S.W.2d 696.

Plaintiffs' evidence, with no attempt by the defendants to refute it, does show acts and conduct on the part of Walter occurring in the early part of 1949 before Walter was hospitalized and occurring again in 1952 for a period of time before his death, from which it reasonably could be inferred that Walter was mentally incompetent during those times. However, the warranty deed was executed May 13, 1950, and the quitclaim deeds were executed November 17, 1950, after Walter had received medical treatment and had been released from the hospital.

■ In determining whether or not Walter possessed sufficient mental capacity to execute the warranty deed or to direct the execution of the quitclaim deeds we must keep in mind that the warranty deed was not a business transaction between Walter and Evalena, and that Evalena does not claim that she obtained any right to retain title to the land by virtue of that deed alone. We must also keep in mind that the execution of the quitclaim deeds at the direction of Walter also was not a business transaction where each party endeavors and expects to get all the benefit he can. Hedrick v. Hedrick, 350 Mo. 716, 168 S.W.2d 69. If Walter could understand, in a reasonable manner, the nature and effect of his acts and if he had the mental capacity to know the extent of his property and his relatives and their claims on his bounty, he had sufficient mental capacity to make or direct the execution of the deeds in question. Hedrick v. Hedrick, supra; Lastofka v. Lastofka, 339 Mo. 770, 99 S.W.2d 46; Edinger v. Kratzer, supra.

■ It may fairly be stated that the entire record indicates that the various abnormal acts on the part of Walter testified to by plaintiffs' witnesses to demonstrate mental incapacity, for the most part if not entirely, occurred either in 1949 before his hospitalization or in 1952 during his illness which resulted in his death. Mental weakness is not enough to justify setting aside a deed, but the proof must clearly show that the grantor did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of his acts. Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699; Allen v. Kelso, supra. The testimony of plaintiffs' lay witnesses upon which they based their opinions that Walter was not mentally competent at or near the time of the execution of the deeds in question was for the most part vague, and in more than a few instances, inconsistent

and conflicting concerning the time of the occurrence of the conditions and acts of Walter. On the other hand there is substantial evidence that at the time the deeds were executed Walter understood what property he owned and he recognized and knew his relatives and their claims on his bounty. The medical witnesses could only speculate as to the mental condition of Walter at the time the deeds were executed. The testimony of the two attorneys who drafted the deeds in question was that he was mentally competent and that he understood what he was doing. Their testimony was based on their personal observation and their discussions with him at the time of the execution of the deeds. When we take into consideration the above referred to testimony and all the other evidence in this case we must conclude that from the record as a whole, the plaintiffs have not presented that evidence which will clearly justify the conclusion that at the time Walter and Mamie Cleo executed the warranty deed, or at the time Walter directed the execution of the quitclaim deeds, he did not have sufficient mental capacity to understand in a reasonable manner the nature and effect of his acts or to know the extent of his property and to know his relatives and their claims on his bounty. We have reached this conclusion from weighing all the evidence without deference to the findings of the trial chancellor, but this conclusion is in accord with his findings, and he was in a better position to have judged the credibility of the witnesses who appeared before him.

Plaintiffs next contend that their evidence established a "close relationship" between Walter and Evalena, and that the facts gave rise to a presumption of undue influence which defendants did not overcome.

A confidential relationship exists between two persons, whether their relations be such as are technically fiduciary or merely informal, whenever one trusts in and relies on the other. The question is whether or not trust is reposed. Horn v. Owens, Mo.Sup., 171 S.W.2d 585. Evalena handled Walter's affairs after the divorce. He endorsed his pension checks and she deposited the money in the bank and wrote checks on his account to pay his bills. In addition Walter conveyed real estate to her to hold the legal title with the understanding that she was to reconvey title back to him. These facts established a confidential relationship between Walter and Evalena. However, in Loehr v. Starke, 332 Mo. 131, 56 S.W.2d 772, 778, this court en banc stated that "it is not the rule in this state that a mere confidential relation raises a presumption of undue influence." See also Lastofka v. Lastofka, supra; Hamilton v. Steininger, supra; and Horn v. Owens, supra. Undue influence will not be inferred or assumed from the mere showing that a confidential relationship existed between the grantor and grantee, but the burden is upon the one challenging the deed to adduce facts and circumstances from which it may be inferred undue influence was exercised. Lastofka v. Lastofka, supra; Hamilton v. Steininger, supra; Horn v. Owens, supra. If these facts and circumstances are shown, they are, of course, rebuttable, and the grantee of the deed, or those claiming under him, may show that the grant was not the result of undue influence but was the voluntary act of the grantor. Patton v. Shelton, 328 Mo. 631, 40 S.W.2d 706. Therefore, when facts and circumstances are shown from which undue influence may be inferred, and there is evidence to rebut this inference, it becomes a question for the trier of fact based upon all the evidence whether the influence is undue in that it arose to the mark of persuasion, coercion, force or deception as to break the will of the person overinfluenced and put in its stead the will of another. Hedrick v. Hedrick, supra; Horn v. Owens, supra.

There is no evidence in this case from which it may be inferred that Evalena did anything to bring about the

execution of the warranty deed, or that she knew or had any reason to know that she was the grantee in that deed until after it was prepared in its final form. There is no evidence that Evalena did anything to bring about the execution of the quit-claim deeds contrary to the free will of Walter or that she influenced Walter in his instructions to Ray Daniel concerning the preparation and execution of the quit-claim deeds, except as may be inferred from her mere presence, and her presence was not inconsistent with the absence of undue influence because it was necessary that she be the grantor in the first of the two quitclaim deeds. The mere opportunity to influence, or mere suspicion of undue influence, unsupported by evidence showing its actual existence, is not sufficient to invalidate a deed. Hamilton v. Steininger, supra; Teckenbrock v. McLaughlin, 209 Mo. 533, 108 S.W. 46. But assuming that the facts and circumstances in this case are sufficient to authorize an inference of undue influence, we then have a question for the trier of fact, and when we review the entire record and take into consideration all the evidence and circumstances, we must conclude that the evidence does not establish such acts or conduct on the part of Evalena which would justify or require the relief requested by the plaintiffs on the grounds of undue influence.

The weight of the competent and credible evidence is strongly in accord with the findings of the trial chancellor. The judgment is affirmed.

BOHLING and BARRETT, CC., concur.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court.

All concur.