In the ESTATE OF Bess F. HEBBELER, Deceased.

Marie E. HEBBELER, the Personal Representative of the Estate of Bess F. Hebbeler, Bryan C. Hebbeler, and Ellen C. Zobrist, Petitioners/Appellants,

v.

Obie D. YOUNG, Verma L. Young and Barbara L. Young, Respondents/Respondents.

No. 63245.

Missouri Court of Appeals,
Eastern District,
Division Four.

March 15, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 13, 1994.

Application to Transfer Denied
May 26, 1994.

**164**

Charles A. Redd, Andrew B. Mayfield, St. Louis, for petitioners/appellants.

Joseph P. Cunningham, III, Crystal City, for respondents/respondents.

GRIMM, Presiding Judge.

This is a probate action for discovery of decedent Bess Hebbeler's assets. Decedent's personal representative, Marie Hebbeler, and Marie's son and daughter as devisees (Relatives) brought the action against Obie, Verma, and Barbara Young (Friends). Relatives allege that Friends, while decedent was alive, were in a confidential and fiduciary relationship with her and obtained assets by exerting undue influence over her.

After a bench trial, the trial court entered judgment in Friends' favor. Relatives appeal; we affirm.

Relatives raise three points. They contend: (1) the trial judge erred in refusing to recuse himself and failing to grant a new trial after soliciting campaign contributions from the parties' attorneys during the trial; (2) the trial judge erred in permitting decedent's former attorney to testify in violation of her attorney-client privilege; and (3) "the judgment is not supported by substantial evidence, involves an erroneous application of the law by the trial court, and is against the weight of the evidence."

## I. Background

### A.

Marie Hebbeler and decedent married brothers in the mid–1940's. Brothers' parents ran what is now known as the Pepsi–Cola Bottling Company of New Haven. Parents died in 1964–65. Marie * and her husband, until his death in 1975, operated that business. They had two children, Bryan and Ellen.

Decedent and her husband lived on a farm in Jefferson County near Hematite. They did not have any children.

While parents were living, decedent and her husband travelled to New Haven for visits frequently. After their death, the visits diminished. However, the two brothers visited regularly until both became ill in the early 1970's; they both died in 1975.

Thereafter, the two sisters-in-law kept in touch, primarily by phone and correspondence. However, Marie and her two children would drive to Hematite to see decedent several times a year.

### B.

Decedent and Verma Young had been acquainted since at least 1957. They were neighbors, became friends, and would occasionally eat lunch together. In February, 1987, decedent telephoned Verma asking for help in getting her papers together for income tax preparation. Decedent was crying and very upset. Decedent's cousin had been assisting her with the finances, but she no longer wanted his help. Verma went to decedent's home and helped get the papers together.

Thereafter, Verma assisted decedent with her finances by: (1) accompanying her to the tax return preparer's office and answering some of the preparer's questions, (2) writing checks for her signature, (3) depositing checks into her account, and (4) otherwise generally helping her with her accounts.

Verma and her husband Obie began calling or visiting decedent several times per week. Also, they helped her with the household and farm chores. In addition, decedent relied solely on Verma and Obie for transportation. In 1987, Verma and Obie took decedent dinners on Thanksgiving and Christmas.

### C.

On February 22, 1988, decedent fell outside her house. Obie found her in a semiconscious state. Obie and Verma then took

---

* We refer to individuals by their first name for ease of reading, and not out of disrespect.

her to the doctor's office and hospital. Although decedent initially had difficulty, her understanding "became clear" after two or three days.

About the fifth day of decedent's hospital stay, Verma and decedent discussed the need to pay one of decedent's bills. Decedent told Verma to place her name on her checking account so that Verma could pay decedent's bills. Decedent and Verma executed a signature card retitling decedent's checking account. On March 1, 1988, decedent gave written authorization for Verma and Obie to be "on" her safe deposit box.

Decedent was discharged from the hospital on March 3, 1988. Following a discussion with her doctor, Verma and Marie decided to put decedent in a nursing facility in New Haven. Verma gave Marie five blank checks on decedent's checking account which Verma had signed so that Marie could pay some bills.

Between March 8 and 10, 1988, Verma and Obie went to New Haven and obtained decedent's signature on documents authorizing the retitling of her certificates of deposit. The next day, Verma and Obie's names were added to the certificates.

Also, on March 10, decedent, Verma, Obie, and Marie met with attorney Charles Redd. Marie thought then that decedent was "sufficiently capable in her own mind [that she did not require] a guardianship or conservatorship."

Attorney is a member of the law firm that regularly represents Marie and her company. On March 5, Marie contacted the firm and following several telephone conversations, they decided to discuss a durable power of attorney with decedent.

Concerning the March 10 meeting, Verma and Obie testified that they brought up the fact that the checking account and certificates had been retitled. Further, they said that Attorney told decedent, "you know, if something happens to you, this bank account and these certificates will go to [Verma and Obie]." They said decedent replied, "That's the way I want it." Attorney agreed with these statements, except he said that the certificates of deposit were not mentioned.

A will for decedent was not discussed that day.

On March 14, Attorney called Marie and discussed the "need to avoid guardianship and conservatorship." He prepared a durable power of attorney and, on March 15, met with decedent. Decedent executed the power of attorney, and appointed Marie and Verma as attorneys-in-fact.

Although the record is unclear, apparently on March 14 Attorney "mentioned somewhat in passing" that decedent should have a will. However, according to Attorney, "there was no specific discussion at that point with regard to what the dispositive plan should be or who the designated fiduciaries should be or anything like that." Attorney received that information from Marie by phone between March 14 and April 14, the day decedent executed her will.

Attorney drafted the will based upon conversations between he and Marie. That will appointed Marie Personal Representative and her children as alternates. With the exception of a $500 gift to a church in New Haven, all the assets went to Marie's two children equally. If Marie did not leave any descendants, all assets went to the New Haven Chamber of Commerce. The will included the usual certification of witnesses: "that we believe her to be of sound mind and memory, of age 18 or older, and acting freely."

Also, in early April, Marie thought decedent should move to a different facility. Marie thought "it was just simply inappropriate for [decedent] to be there since she was improving, and it wasn't a good surrounding for her." As a result, she and Verma decided to move her to the De Soto Residential Care Apartments. Marie thought it was a good choice "because there were many friends there who would call her and who would come to see her and she would be happier there." Decedent was moved on April 15, the day after she executed her will.

In a series of transactions during the next four months, decedent conveyed large portions of her assets to Friends. Specifically, with the help of lawyer Roland Wegmann, she transferred many of her stocks into joint

ownership with Verma and Obie's daughter, Barbara. When Lawyer explained the legal ramifications of the transfers with decedent, she told Lawyer that "this is what she wanted to do."

Early in the week of May 16, 1988, Verma and Obie brought decedent to Lawyer's office. Decedent wanted to deed her property to Verma and Obie, and wanted to revoke the power of attorney. Lawyer met with them for about an hour. He prepared the revocation that day.

A few days later, Lawyer took a deed to De Soto and visited with decedent privately. He explained to her "as thoroughly as [he] knew how what the ramifications of her act was. And she told [him] that this is what she wanted to do. And [he] said, 'Fine. Let's get a notary public, and we'll get the deed signed.'" However, a notary was not available; thus, decedent did not sign the deed that evening.

On May 20, 1988, Lawyer went back to De Soto, taking a notary. He again went over the transaction with her; decedent signed the deed in front of the notary.

At some point, Lawyer asked decedent why she was leaving everything to Friends. They discussed her relationship with Friends. Lawyer testified that she said, she "liked them," "knew them," and referred to them regularly as her friends and as people that she wanted to have her property.

On August 8, 1988, decedent executed a will and a power of attorney that Lawyer prepared. Lawyer was appointed Personal Representative. The will confirmed the transfers of land and stock to Friends. Also, it provided that if any of the transfers were successfully challenged, the property would be devised to Friends. Also, the will devised the residue of the estate, which primarily was Pepsi Cola stock, to decedent's nephew Bryan. The power of attorney appointed Verma and Obie as decedent's attorneys-in-fact.

About fifteen months later, a petition was filed alleging the incapacity and disability of decedent. Following a hearing on December 22, 1989, the court appointed Marie decedent's legal guardian and conservator of her estate. On May 29, 1990, Marie as guardian and conservator filed this petition for discovery of assets. On March 10, 1991, decedent died. The petition was transferred from the conservatorship proceeding to the decedent's estate.

## II. Recusal

■ For their first point, Relatives contend that the trial judge erred in refusing to recuse himself and order a new trial "because his solicitation of campaign contributions from the parties' attorneys during the bench trial of the action directly violated Canon 7 of the Missouri Code of Judicial Conduct and created an appearance of impropriety in violation of Canons 1 and 2 of the Missouri Code of Judicial Conduct."

This trial began on June 25, 1992. It continued on June 26, July 9, July 28, August 12, September 14, and concluded on September 23. The trial court granted the parties time to file proposed findings and conclusions. On November 2, 1992, the trial court issued its findings, conclusions, and order in favor of Friends.

Approximately two-thirds of the way through the trial, on August 17, 1992, the Committee to Re-Elect Judge Earl Blackwell Circuit Judge sent all of the parties' attorneys a form letter. The letter said:

> Campaigns are very expensive ... even for Judges. If you can help, it will be deeply appreciated.
>
> Thank you.
>
> > Sincerely,
> >
> > /s/ Earl R. Blackwell
> > EARL BLACKWELL
>
> P.S. If it is possible for you to contribute more, that will also be very much appreciated. More tickets on request.
>
> > ERB

Enclosed were two $100 tickets to a September 24 fund raiser. Relatives' attorneys did not contribute; Friends' attorney did.

Relatives' attorneys did not raise any objection to the solicitation when received. However, in their post-trial motions filed November 17, they asked that Judge Blackwell recuse himself for violating the Canons of

Ethics by personally soliciting campaign contributions. Also, in their motion for new trial, they claimed they were entitled to a new trial because Judge Blackwell failed to recuse himself when he made the improper solicitations.

Canon 7 B(2) of the Code of Judicial Conduct provides:

A candidate, including an incumbent judge, for a judicial office that is filled by public election between competing candidates *should not himself solicit or accept campaign funds* ... but he may establish committees of responsible persons to secure and manage the expenditure of funds for his campaign.... (emphasis added).

We do not condone Judge Blackwell's conduct. It appears that the solicitation letter was a violation of Canon 7 B(2). Upon timely request, Judge Blackwell should have disqualified himself.

When cause exists to disqualify a judge after the pleadings have been filed, "the application [to disqualify the judge] shall state the time when the cause arose or when applicant acquired information and knowledge thereof, *and the application must be made within five days thereafter.*" (Emphasis added). § 508.120, RSMo 1986.

Here, the cause arose on August 22 when Relatives' attorneys received the solicitation letters. Clearly, Relatives' attorneys "acquired information and knowledge thereof" the day they saw the letter. However, they did not file an application to disqualify until November 17, almost three months after the cause arose.

Obviously, the application was not filed within the statutorily required five days. Further, the application was not made until fifteen days after Relatives had received the trial court's adverse judgment.

In *State v. Carlson,* 66 Wash.App. 909, 833 P.2d 463, 464 (Div. 1 1992), the prosecuting attorney was honorary co-chair and nominal finance chair of the reelection committee for a member of the three-judge panel which heard the defendant's appeal. After receiving an adverse ruling on appeal, the defendant sought reargument. The defendant contended that the prosecutor's campaign

participation required the judge to recuse herself from any participation in the case.

In denying the motion, the court stated:

When a party or counsel has a reasonable and justifiable concern that a judge will be biased or unfair he has an obligation to move as promptly as possible to request that the judge recuse herself so as to minimize any disruption or delay.... He cannot wait until he has received an adverse ruling and then move for disqualification.

*Id.* 833 P.2d at 467. (footnote omitted).

The *Carlson* holding is applicable here. *Carlson* held that a party cannot wait to complain. Here, two days of hearings were conducted after the letter was received, but no complaint was made. Nor did Relatives' attorneys take issue with it when they filed their proposed findings and conclusions. They raised the issue only after receiving an adverse ruling.

In *State ex rel. Wesolich v. Goeke,* 794 S.W.2d 692 (Mo.App.E.D.1990), a party in a dissolution proceeding alleged that the trial judge's comments in a pre-trial conference demonstrated bias and prejudice against her. She promptly filed a motion to disqualify the judge, which the judge denied. She then promptly sought a writ to compel the granting of the motion. This court granted the writ. In so doing, we gave this guidance:

First, the challenged judge should determine if the motion is procedurally adequate: Does it meet the statutorily prescribed requirements of time, of notice, and of form? ... If the motion is procedurally inadequate ... the judge should deny the motion to disqualify.

*Id.* at 698–99. Here, Relatives' motion for recusal was procedurally inadequate. It did not meet the statutorily prescribed time requirements.

However, Relatives argue that Judge Blackwell "had an absolute duty to recuse himself, and his failure to do so requires a new trial." They primarily rely on *Ham v. Wenneker,* 609 S.W.2d 240 (Mo.App.W.D. 1980).

In *Ham*, during a trial, evidence was presented which the trial judge felt obligated her to exercise the duty of recusal. The trial judge inquired if anyone objected to her proceeding. No objection was made, and the trial was concluded. *Id.* at 241.

The facts set forth in *Ham* are sparse, but it appears that the recusal could have been waived pursuant to Canon 3 D. However, the Canon 3 D remittal process was not followed, and the western district reversed. *Id.*

Here, unlike *Ham*, nothing in the record or during the proceedings indicates that bias or prejudice actually existed. To the contrary, in their brief, Relatives say that they "wish to make clear that they do not contend that there was any improper motive behind [Friends' attorney's] contribution to Judge Blackwell's campaign or that Judge Blackwell was actually influenced in any way by [that] contribution or [Relatives' attorneys'] refusal to contribute." Thus, *Ham* is not applicable. Point denied.

### III. Attorney Testimony

■ For their second point, Relatives contend that the trial court "committed prejudicial error requiring a new trial by allowing [lawyer] to testify in violation of [decedent's] attorney-client privilege." Relatives argue that Marie, as personal representative, alone had the power to waive the attorney-client privilege between lawyer and decedent.

■ Section 491.060(3), RSMo Cum.Supp. 1993, prohibits an attorney from testifying "concerning any communication made to him by his client in that relation, or his advice thereon, without the consent of such client." However, after the death of a client, the attorney-client privilege can be waived by a representative of the client. *Walton v. Van Camp*, 283 S.W.2d 493, 499 (Mo.Div. 2 1955).

The facts in *Walton* are similar to the case here, and the reasoning is applicable. In *Walton*, a deceased's heirs brought suit to set aside a deed made by the deceased during his lifetime. *Id.* at 496. The court held that the grantee under the deed was a representative of the deceased; thus, he was entitled to waive the deceased's attorney-client

privilege. *Id.* at 499. The court reasoned that it "would be unjust to hold that the privilege belonged to one set of such claimants and not to the other." *Id.* *See also Wilcox v. Coons*, 359 Mo. 52, 220 S.W.2d 15, 19 (Mo. banc 1949) (Suit between grantees in a deed and a devisee in decedent's will where both sides were claiming under decedent through competing instruments. Either the grantees or the devisee could waive the privilege.)

Here, Relatives and Friends both claim through competing instruments that decedent executed during her lifetime. Applying the reasoning of *Walton* and *Wilcox*, either Relatives or Friends could waive the attorney-client privilege concerning the disputed instruments. Point denied.

### IV. Evidentiary Support

■ For their third point, Relatives contend "[t]he judgment in favor of [Friends] should be reversed and a new trial ordered because the judgment is not supported by substantial evidence, involves an erroneous application of the law by the trial court, and is against the weight of the evidence."

This point does not comply with the requirements of Rule 84.04(d). *See Thummel v. King*, 570 S.W.2d 679, 685 (Mo. banc 1978). Nevertheless, we review for plain error.

Relatives argue that a presumption of undue influence arose, and that there was insufficient evidence to overcome the presumption. They refer to evidence supporting the presumption of undue influence which, they contend, the trial judge ignored. Also, they challenge several specific rulings of the court. However, the record contains substantial evidence supporting the trial court's judgment that decedent was not under undue influence at the time of the transactions.

First, we note that apparently Marie and Attorney thought decedent was mentally competent on April 14, 1988. On that date, decedent executed the will in Attorney's presence, and the witnesses acknowledged that she was of "sound mind and memory," "acting freely." Further, decedent moved to a different facility because Marie thought decedent was "improving."

Also, although Lawyer met with decedent and Verma for his first conference, he twice met privately with her. He assured himself that she understood the consequences of her actions, and that she was acting freely.

Further, decedent executed a new will on August 20, 1988. The subscribing witnesses certified that she was of sound mind that day. Also, decedent executed another will on October 2, 1989. The contents of this will, apparently prepared by Marie's attorney, were virtually identical to the April 14, 1988 will. These subscribing witness also believed her to be of sound mind and memory, and acting freely.

Finally, we note the testimony of Tammy Missey. She was the De Soto Residential Care Apartments' Director of Nursing from May 15, 1987 until May 30, 1989. She became acquainted with decedent shortly after she arrived in April, 1988. Suffice to say, her testimony indicated decedent was alert, oriented, and fully in charge of making her own decisions. She testified that decedent had no trouble understanding questions, recognizing names, communicating her wishes or making decisions for herself. Point denied.

The trial court's judgment is affirmed.

CARL R. GAERTNER and AHRENS, JJ., concur.